252 A.2d 354.

STATE *vs.* THURSTON L. WINSTON.

APRIL 25, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J.   A superior court jury found the defendant guilty of murder in the first degree.   His motion for a new trial was denied by the trial justice.   In this appeal, he presses three exceptions to certain rulings made by the trial court.

At approximately 1:38 a.m. on Christmas morning, December 25, 1965, Patrolman Donald Zubiago was in his po-

lice car on patrol in the South Providence area. At this time, he received a radio message to go to 11½ Tanner Street and investigate a report of requested medical assistance. Officer Zubiago proceeded to the Tanner Street address. He entered the first floor premises and there in a rear bedroom observed the dead naked body of two and one-half-year-old Andrea Fonseca. The infant had been stabbed and there was visible evidence that she had been sexually assaulted. There were blood stains in various areas of the bedroom and an adjoining kitchen. The officer contacted his superiors and notified them of what he had found.

Several off-duty detectives were ordered to the scene of the crime and an investigation commenced immediately. Eddy Fonseca, a seven-year-old uncle of the dead baby, told the police that his mother had left the house early Christmas Eve leaving Eddy and his niece alone in the house. When asked if any persons came to the premises after the mother's departure, Eddy replied that "Bego" had visited the tenement at approximately 9:30 p.m. and left. Detective John Leyden recognized "Bego" as a name used by defendant. The defendant resided about four houses down the street.

At 3:25 a.m. Officer Leyden and two other officers went to defendant's home, woke him up and brought him to police headquarters. There defendant admitted that he had returned to the Fonseca home[1] after midnight, took the infant from the front room to a bedroom where he "raped" her and then killed her. The state's chief medical examiner testified that the child had been stabbed three times. One wound was superficial but the other two were each four inches in depth. An examination of the vaginal area

---

[1]Eddy slept soundly during the entire time of defendant's second visit. He woke up to admit his father into the home. It was his father who was responsible for the call to the police.

disclosed that there had been penetration. There was also evidence that the baby had received blows to her chin. The physician attributed death to a massive hemorrhage which was due to the two deep stab wounds. The murder weapon was a knife described by one officer as the type used to butter bread.

The defendant's first exception concerns his objection to the use of photographs which showed Andrea dead in the bed and as she appeared in the morgue prior to the autopsy. He employs all the usual objections heard when this type of evidence is sought to be used at a trial. He claims that the pictures should not have been admitted because they are "grotesque, gruesome, inflammatory and prejudicial" and had little or no probative value.

It is generally held that photographs of the victim in a prosecution for homicide, which are shown to be faithful representations of the victim at the time in question, are, in the discretion of the trial court, admissible into evidence as an aid to the jury in arriving at a proper understanding of the evidence as proof of the corpus delicti, the extent of injury, the condition and identification of the body or for their bearing on the question of the degree of atrociousness of the crime, even though such photographs may tend to have an influence beyond the strict limits for which they were introduced. See: 2 Wharton's, *Criminal Evidence*, §§686-688; 159 A.L.R. 1413; 73 A.L.R.2d 769. Our previous rulings in this area are in conformity with the general rule. *State* v. *Greene*, 74 R. I. 437, 60 A.2d 711; *State* v. *Smith*, 70 R. I. 500, 41 A.2d 153; *State* v. *Miller*, 52 R. I. 440, 161 A. 222.

At the trial defendant admitted the homicide and now argues that the pictures had no probative value. However, at that time in the superior court the prosecution could not anticipate what facts defendant might admit or what defenses he might invoke and, therefore, it was entitled

to produce such competent and material evidence as it deemed necessary to establish the offense charged. *State v. Greene, supra.* We have examined the photographs in dispute and find them not to be as offensive as they are portrayed by defendant. While admittedly it is not a pleasant task to look at pictures of the mutilated body of a small child, it is also true that the killing of a child of tender years is not a pleasant episode. The fact that a picture may depict the details of a shocking crime is no reason to bar its use. While this court will not countenance the use of photographs whose sole purpose is to inflame a jury, defendant has failed to show us that the use of the disputed evidence amounted to an abuse of the trial justice's discretion.

The trial justice in his charge to the jury told it that it could return one of three possible verdicts—murder in the first degree, murder in the second degree or not guilty. The second exception before us is to the trial justice's refusal to instruct the jury that it could also return a verdict of manslaughter. The defendant admits that a request to charge must have some evidentiary basis. He contends, however, that there is present in the record evidence from which the jury, if properly instructed, could have found defendant guilty of manslaughter.

This evidence, defendant asserts, is found in the two statements he voluntarily gave to the police. In a statement which is in a narrative form, defendant said that after his first visit to Eddy and Andrea, he walked to a nearby night club where he had a few drinks; that as he started homeward, he had an "impulse" to return to the Fonseca home; that he entered the tenement and saw the baby on the living room couch; that he took her to the bedroom where on "impulse" he tried to have intercourse with her; that he heard a noise and on "impulse" went into the kitchen to obtain a knife and that he returned to the

bedroom and killed the infant. The second statement was in the form of police questions and defendant's answers. His replies are saturated with the word "impulse."

The defendant argues that his frequent use of the word "impulse" shows that his slaying of Andrea was a sudden and unintended action. This being so, he claims that the homicide was not premeditated. There being no premeditation, defendant claims he is guilty of, at most, manslaughter.

Although defendant's knowledge of semantics is commendable, we must fault his concept of manslaughter. In *State* v. *King,* 37 N. J. 285, 181 A.2d 158, there is found the following informative discussion as to the historical development of the distinction between murder and manslaughter:

> "As late as the sixteenth century, murder in England was understood to mean a homicide accomplished in furtherance of 'a deliberate, premeditated intent to kill formed some time beforehand and that no killing "on a sudden" even without provocation or on slight provocation was considered murder.' *Royal Commission on Capital Punishment Report,* 1949-1953, pp. 27-28 (1953). At that time distinction between murder and manslaughter rested upon the simple distinction between a killing upon waylaying and premeditation, and a sudden falling out. Gradually, commencing with the seventeenth century, the law superseded this oversimplified view and recognized that a homicide must be judged principally by the extent to which the circumstances of a case show 'on the one hand, brutal ferocity, whether called into action suddenly or otherwise, or on the other, inability to control natural anger excited by a serious cause.' 3 *Stephen, History of the Criminal Law of England,* 71 (1883). Thus the law, while retreating from its sixteenth century absolution of the killer 'on a sudden,' recognized the frailties of man and ameliorated the punishment for a homicide by the nature of its moral character. Over the years the test of 'serious cause,' in England came to be re-

ferred to as provocation. The reduction of the homicide from murder to manslaughter by provocation is a two-state proceeding in England, (1) the provocation must be so gross as to cause the ordinary reasonable man to lose his self control and to use violence with fatal results, and (2) the defendant must in fact have been deprived of his self control under the stress of such provocation and must have committed the crime while so deprived. *Holmes* v. *D. of P.P.* [1946] *A.C.* 588; *Mancini* v. *D. of P.P.* [1942] *A.C.* 1."

In *State* v. *Smith,* 93 A. 1, this court declared that whether a crime is to be classified as murder or manslaughter depends on " * * * whether the killing was done 'with malice aforethought express or implied,' which is an essential characteristic of murder, or whether it was 'committed under the influence of sudden passion produced by adequate provocation which would reduce the crime to manslaughter' * * *." We are of the opinion that before defendant's impulse theory could be invoked which would allow a reduction of the crime described herein from murder to manslaughter, there had to be present in the record evidence that Andrea's death occurred during the heat of defendant's passion which in turn had been caused by reasonable provocation. This type of homicide is referred to as voluntary manslaughter. It is a crime which is committed suddenly without reflection and rejects the suggestion that it was the result of premeditation. However, an essential element of this offense is the presence of provocation offered by the person slain. See 1 Wharton's, *Criminal Law & Procedure,* §§274, 276. Here defendant's ingenious attempt to convert his savagery into a lesser degree of homicide fails because of the obvious lack of evidence that his so-called impulse was the result of some provocative act of the infant. The trial justice's refusal to charge on the issue of manslaughter was correct.

In this case the jury's guilty verdict was returned on June 13, 1966. Two weeks later on June 28, 1966, the trial

justice denied defendant's motion for a new trial and then
continued the case to August 3, 1966 for the imposition of
sentence. The administrator of probation and parole was
ordered to prepare and furnish the court with a presentence
report. The report was to be given to the trial justice
sometime prior to the date designated for the imposition
of sentence. The record shows that on September 12, 1966,
the attorney general moved that defendant be sentenced.
The court, however, noted that defendant's counsel was
not present in the courtroom and refused to impose sen-
tence. The defendant returned to the superior court on
October 3, 1966, and was sentenced to spend the rest of
his natural life at the adult correctional institutions. The
trial justice denied defendant's request to make the sen-
tence effective as of June 13, 1966—the day the jury found
him guilty. It is this denial which is the subject of defend-
ant's last exception.

It is true, as defendant points out in his brief, that in
*State* v. *Bradshaw*, 101 R. I. 233, 221 A.2d 815, we held that
there is no need for a presentence report where, as here,
the court has no discretion as to the amount of the sen-
tence. However, when Winston was before the superior
court on June 28, 1966, *Bradshaw* had not been published.
The superior court, when it ordered the presentence report,
was following what was at that time the usual procedure
preceding the imposition of sentence.

This interval between conviction and sentence is referred
to in the language of the jailhouse as "dead time." Trans-
lated, it means that this time period cannot be used in de-
termining when a prisoner will be eligible for parole. G. L.
1956, §13-8-13, as amended, provides that a prisoner who
has been convicted of murder in the first degree may not
seek parole until he has served 20 years. The defendant's
concern about a prompt consideration of his request for
parole is best directed to either the legislative or executive

branch of our government. It is basic law that punishment which the legislature exacts for a crime does not begin until the accused has been convicted and sentenced. There was at the time sentence was pronounced no statute[2] in this state requiring the trial judge to give a person credit for time spent in custody prior to trial and in the absence of such a statute a prisoner is not entitled as a matter of right to credit for his presentence jail time. *State* v. *Sanders*, 251 S. C. 431, 163 S.E.2d 220; *State* v. *Lackey*, 97 Okl. Cr. 41, 257 P.2d 849; *People ex rel. Stokes* v. *Warden*, 66 N. Y. 342.

In *Shahinian* v. *Langlois*, 100 R. I. 631, 218 A.2d 461, we repeated the well-established rule that one who is convicted of a crime is entitled to be sentenced within a reasonable time thereafter. Here, sentence could not have been imposed until the defendant's motion for a new trial had been decided. We do not believe that the hiatus of a little more than three months between the day of the denial of the new trial motion and the imposition of sentence was unreasonable.

All of the defendant's exceptions are overruled and the case is remitted to the superior court for further proceedings.

---

[2]On May 22, 1968, P. L. 1968, chap. 125, became law. This act specifically states that when imposing a sentence of imprisonment, the court shall reduce the sentence by the number of days defendant has spent in confinement while awaiting trial and sentencing. The legislature further provides that in the case of a prisoner given a life sentence, the time at which he shall become eligible for parole shall be reduced by the number of days he was imprisoned while awaiting trial and sentencing. The general assembly gave this statute a retroactive effect by providing that any prisoner serving a sentence, including a life sentence, at the time of its enactment may petition the sentencing court and ask that he be accorded the benefit of the new law. The defendant may be a beneficiary of the legislature's benevolence.

*Herbert F. DeSimone,* Attorney General, *Luc R. La-Brosse,* Special Assistant Attorney General, *Donald P. Ryan,* of counsel, for plaintiff.

*James Cardono,* Public Defender, *Eugene F. Toro,* Assistant Public Defender, for defendant.