**STATE**

v.

**Raymond LASSOR.**

**No. 87–417–C.A.**

Supreme Court of Rhode Island.

March 9, 1989.

James E. O'Neil, Atty. Gen. and Annie Goldberg, Asst. Atty. Gen., for plaintiff.

Robert B. Mann, Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on the defendant's appeal from his conviction of three counts of murder in the first degree, one count of attempted murder, and one count of first-degree sexual assault after trial by jury in the Superior Court. We affirm. The facts of the case insofar as pertinent to this appeal are as follows.

The defendant, Raymond Lassor, was charged in a single five-count indictment with the first-degree murders of Lori Carlucci, Wanda Adams, and Delores Neuser. He was also charged with first-degree sexual assault upon and attempted murder of Carrie–Ann Talbot. The circumstances prompting the indictment took place within a period of three months from June 1984 to September 1984. Three women were brutally murdered in the downtown area of the city of Providence. The three murders were committed within a radius of one-half mile from one another. Lori Carlucci was murdered on June 26, Wanda Sue Adams

was murdered on August 16, and Delores Neuser was murdered on August 30. Although the police suspected that the same person had committed all three crimes, no identifiable person came to their attention as the assailant.

On September 17, 1984, defendant and Talbot met at the Sabin Street bus station in downtown Providence. They had been previously acquainted. From the bus station they walked across the street to the Journal–Bulletin garage where they sat in a Journal–Bulletin truck and "smoked a joint". Their next stop was a liquor store, also located in downtown Providence, where defendant bought a six-pack of beer and a package of cigarettes. They then went to another liquor store to buy a bottle of peppermint Schnapps. Talbot bought something to eat at the McDonald's on Fountain Street before she and defendant proceeded by bus to Roger Williams Park in Providence. Both entered the park where they finally rested between the baseball field and the tennis courts. Both smoked another marijuana cigarette and consumed some beer. Talbot testified that she drank one beer and that defendant drank "a few". Sometime thereafter, defendant made several sexual advances toward Talbot, which were rejected, and as a result defendant flung Talbot to the ground and rendered her momentarily unconscious. When Talbot regained consciousness, she found defendant sitting on her chest, choking her with his hands, and again she fainted. Talbot testified that when she again regained consciousness, defendant kicked her in the forehead and knocked her out. When Talbot regained consciousness for the third time, she was alone. She testified that one of her pants legs was down, one boot was off, her underpants were gone, her shirt was pulled up, and her bra was around her neck. Talbot also testified that she felt a sharp pain in her abdomen. This pain was caused by a stick that had been inserted into her vagina. She removed the stick, and by stumbling and crawling, made her way to a main road.

Talbot was later treated at St. Joseph Hospital where it was discovered that she was bleeding internally as a result of the traumatic severance of a portion of her liver. In addition, small twigs, pebbles, and grass were found in her vagina.

The following day, September 18, 1984, the Providence police arrested defendant for first-degree sexual assault. At the time of arrest defendant was advised of his *Miranda* rights by Detective Steven Cross of the Providence police department and then was brought to the Providence police station. The defendant was taken to an interrogation room where he, Detective Cross, and Sergeant William Pedchenko remained throughout the afternoon and into the evening. When they were seated in the interviewing room, Detective Cross showed defendant a copy of the criminal warrant and the criminal complaint. Detective Cross then showed defendant a *Miranda* rights form on which defendant wrote his name. Then defendant read the portion of the form that stated, "having been informed I am a suspect in the crime of," and wrote in the blank space, "first-degree sexual assault". At the direction of Detective Cross defendant then read aloud the remaining portions of the form, which set forth the following statement:

"[V]oluntarily, without threats or promises on the part of the police, [I] make the following statement to members of the Providence police department after having been advised that:

1. I do not have to give a statement.

2. I have a right to remain silent.

3. Anything I say can and will be used against me in a court of law.

4. I have the right to the presence of an attorney prior to and during any questioning by the police.

5. I have a right to the presence of an attorney during a line-up or confrontation of witnesses, if any line-up or such confrontation takes place.

6. If I cannot afford an attorney, one will be appointed for me prior to any questioning if I so desire.

I further admit and agree that:

7. After having been informed of my constitutional rights, I do understand

these rights; and I agree to give a statement at this time.

8. I do not want an attorney called or appointed for me at this time."

After defendant read each line individually, Detective Cross asked him if he understood the meaning of each sentence. He answered in the affirmative and then initialed each line. Detective Cross testified that he specifically asked defendant if he wanted to speak to an attorney before being questioned or to make a phone call. Again defendant stated that he understood each of these rights and that he had nobody to whom he wished to talk. The defendant then proceeded to give the police a confession. He admitted the sexual assault upon Talbot but had no memory of inserting a stick into her vagina or kicking her in the face. The defendant also confessed that he had struck Talbot in the face with his hand a number of times and that he had grabbed her by the neck with both hands just prior to the sexual assault. The defendant's oral confession was typed by Detective Cross. At this time a break of about twenty minutes was taken for lunch. After lunch defendant continued with his statement, and Detective Cross periodically asked him if he wanted to take a break. The defendant insisted on continuing. When his statement was complete, defendant read and signed each page, making only two minor corrections. Detective Cross and Sergeant Pedchenko also signed all six pages. Lieutenant Paul LeBoeuf certified that defendant had sworn under oath to the truth of his statement. Once again a short break was taken.

Upon resuming, Detective Cross informed defendant that he was a suspect in the murder of Lori Carlucci and once again advised him of his rights. The admonitions were communicated to defendant by means of a procedure identical to that described above. The defendant read the form aloud and filled in any necessary information. The defendant, Detective Cross, and Sergeant Pedchenko signed the form.

Soon thereafter Sergeant Pedchenko showed defendant two photographs. One displayed the dead body of Carlucci at the scene where her body was found, and the second showed only the area where her body was found. Detective Cross testified that after defendant stared at the pictures for a moment, he was asked if he had killed Carlucci, to which defendant replied, "I killed all of them". Detective Cross then took defendant's statement regarding the Carlucci murder, using the same procedure utilized in the inquiry into the sexual assault and attempted murder of Talbot. The defendant then confessed to striking Carlucci a number of times, strangling her, dragging her out of the car, and pulling her pants off and underpants down. The defendant also confessed to inserting a plywood stick about two feet long into Carlucci's rectum which caused her to scream. He later qualified this statement by stating that it was "not a real scream but a moan".

After a fifteen minute break Detective Cross informed defendant of his *Miranda* rights before questioning him about the death of Wanda Adams. Again the same procedure regarding the *Miranda* admonitions and the confession-statement forms was followed by Detective Cross. Detective Cross described defendant at this stage in the interrogation as "calm, alert, cooperative". The defendant disclosed that he met Adams at a bus stop in downtown Providence near the train station. The defendant began a conversation with Adams, and they agreed to take a walk to an area near the train station to "smoke a joint". There they sat on top of a wall and dangled their feet over the side above the Providence River. After smoking the marijuana, defendant kissed Adams for about "twenty minutes" and then attempted, and failed at, several sexual advances. When Adams tried to leave, defendant grabbed her, managed to seize her in a headlock, and began to strangle her. At this point Adams was lying down, alive, but not moving. The defendant pulled her pants down and pulled her blouse and bra up to her neck. The defendant told police that at this point when he stood up to fix his shirt, Adams moved in some way that caused her to fall off the wall and into the water. She was later found dead. The medical examin-

er testified that she had died of strangulation prior to immersion.

After a short break, Detective Cross presented defendant with another *Miranda* form. He then informed defendant that this next inquiry would relate to the Delores Neuser homicide. The defendant executed the form according to the identical procedure used in the preceding inquiries, and the same procedure was also followed in taking defendant's confession regarding Neuser. The defendant stated that he visited several bars in downtown Providence and had been drinking heavily from early afternoon until the bars closed on the night Neuser's body was found. Approximately an hour after the bars had closed defendant went to the top floor of The Parkade parking garage, located on Washington Street in Providence, to smoke a marijuana cigarette. The defendant was rolling the cigarette in the stairwell on the top floor when Neuser appeared and asked him what he was doing. The defendant did not reply, and Neuser told him that she was going downstairs to call the police. The defendant placed the cigarette in his pocket, grabbed Neuser from behind, and held her in a headlock for a couple of minutes with his right arm. The defendant stated that they both fell to the floor; then he hit her several times and choked her from the front with both hands. The defendant also stated that he had difficulty recollecting exactly what took place thereafter because he "had been drinking heavily" that night. He did recall that he walked downstairs and ultimately arrived at Orient Street in Pawtucket early in the morning. After the completion of this statement the interrogation was concluded, and defendant remained at the police station overnight.

The next morning, on September 19, 1984, Detectives Steven Cross, John McGehearty, and Sergeant William Pedchenko took defendant in a police cruiser to view and inspect each area where the victims had been found. Having waived his constitutional rights again, defendant directed the officers to each site. The police and defendant then returned to the station, where Detective Cross again informed defendant of his *Miranda* rights for the purpose of making follow-up inquiries regarding the killing of Carlucci. Detective Cross asked defendant if he had been drinking or had used any drugs on the night he killed Carlucci in the parking lot. The defendant answered that he had been sober, that he only had several beers that evening, and that he had not taken any drugs. This statement was taken in the same manner as were the previous statements.

In support of his appeal defendant raises eleven issues. We shall discuss these issues in the order of their significance to the opinion rather than in the order in which they are raised in defendant's brief. Further facts will be supplied as may be necessary in order to address the issues raised.

## I

## THE MOTION TO SUPPRESS THE CONFESSIONS

After hearing the evidence presented by both the state and defendant in respect to defendant's motion to suppress the confessions given to the Providence police, the trial justice determined that the state had proven by clear and convincing evidence (1) that defendant had been "adequately and effectively" informed of his constitutional rights as mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny, and (2) that defendant knowingly and intentionally waived his right to remain silent and his right to counsel, retained or appointed. He further found that defendant did so fully aware that anything he said could be used against him in court.

The defendant concedes that the police carefully advised him of his constitutional rights and that there was no element of coercion used in securing the four confessions that were introduced in evidence against him. He does, however, challenge his ability to understand the *Miranda* warnings and argues that he did not knowingly and intelligently waive his rights.

After examining the record and the transcript of testimony given in the suppression

hearing, we are of the opinion that Detective Cross and Sergeant Pedchenko were scrupulous in their admonitions and made every reasonable effort when discussing the *Miranda* rights and explaining the forms presented to defendant to make certain that he understood the document line by line as he read it aloud. Detective Cross also paraphrased statements on the form in everyday language, such as, "Do you understand, Ray, that you don't have to talk to me? You don't have to say anything?" and "Do you understand, Ray, that whatever you tell me I can go to court and tell the court what you told me?" and "Do you understand that you can have a lawyer here before you talk to me?"

The defendant stated to the police, as he went over the *Miranda* form line by line and was further instructed in everyday language, that he understood his rights and agreed to give a statement. He stated unequivocally that he did not want an attorney and did not wish to use the telephone.

We have scarcely encountered a more thorough and painstaking effort by police officers to inform a suspect of his constitutional rights to silence and counsel, and the consequences of waiving those rights than that disclosed by the evidence in this case.

■ The defendant does not challenge the quality of the admonitions or the lack of coercion by the police but relies solely upon his purportedly limited intelligence and inability to understand the *Miranda* warnings. In respect to defendant's ability to understand his rights and effectively waive them, the state presented four expert witnesses, all of whom testified that defendant had the capacity to understand, as well as to read, the specific description of his constitutional rights, particularly in light of the supplemental instructions given to him by the interrogating officers.

For example, Dr. Mary Wellman testified that she "felt with a reasonable degree of certainty that [defendant] was indeed able to comprehend the *Miranda* warning". Doctor Spencer DeVault came to the same conclusion, relying upon all the circumstances. Doctor Gerald Champagne testi-

fied that defendant was able to read and comprehend the *Miranda* admonitions. Doctor Joy E. Pitterman stated, "I feel that he does understand the content of [the *Miranda*] form and does understand the rights he waived". The defendant presented one witness, Dr. Stephen Imber, whose testimony was somewhat equivocal and whose ultimate conclusion was stated as follows:

"My opinion is that I believe Mr. Lassor would have had a limited understanding of his rights at that point in time. It's not absolutely possible to determine precisely how much he understood at that time. And I don't think anybody can make a definitive statement on that basis, but given his reading, his present reading levels, the results of testing that was conducted years ago, which is pretty consistent with my own findings, given his listening comprehension results, it would appear that his listening understanding would have been less than instructional level. That is, a frustration level, and perhaps some of the more abstract concepts involved might have, or probably would have been beyond comprehension or grasp at that time."

The testimony of the four experts presented by the state, considered in conjunction with the testimony presented by the police officers, leads us to believe that the trial justice committed no error in finding that defendant, who had been steadily employed, married, possessed a license to drive, and functioned normally in the community, was capable of understanding the *Miranda* admonitions and that he knowingly and freely waived his rights to remain silent and to be questioned in the presence of counsel. The fact that Dr. Imber's testimony questioned defendant's ability to understand did not detract significantly from the force of the testimony of the state's experts. The trial justice also took into account that defendant had been found competent to stand trial after examination by a state psychiatrist and passing the required tests for competency. The finding that defendant knowingly and voluntarily waived his rights without any "atmo-

sphere of coercion" is supported not only by clear and convincing evidence but as the trial justice suggested, also by evidence that "far exceeded [the state's] burden of proof." The motion to suppress was properly denied.

## II

### JOINDER OF CHARGES

The defendant unsuccessfully moved pretrial to sever counts under Rules 8 and 14 of the Superior Court Rules of Criminal Procedure. The trial court, in denying said motion, indicated the presence of a common scheme or plan among the charged offenses. The defendant renewed the motion several times throughout the trial, however, to no avail.

■ Rule 8(a) permits joinder of offenses in the same indictment if the offenses charged are "of the same or similar character". We are of the opinion that the offenses charged here were certainly of a similar character. Each offense involved the strangulation or attempted strangulation of the victim. Three of the offenses involved sexual assaults against the victim. Neuser was found nude from the waist down with her sweater pulled up over her breasts. Each offense had a strong overtone of erotic motivation, and all have in common the brutality of the killings or assaults themselves. It is of course true, that two of the victims were further savaged by the insertion of a stick in Talbot's vagina and one in Carlucci's rectum. In fact, an overall pattern of abhorrent sexual behavior, coupled with strangulation and head injuries, can be seen in each of the crimes set forth in this indictment. Consequently, the offenses were properly joined under Rule 8(a) as being "of the same or similar character". Moreover, Rule 8(a) goes on to provide that offenses may be joined when based "on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan". The trial justice in the case at bar found that these cases did disclose a common scheme or plan. They were also connected by virtue of a single interrogation in which defendant in substance confessed to the commission of all five criminal offenses. Thus, unquestionably, there was proper joinder pursuant to Rule 8(a).

■ This does not end our inquiry since even though offenses may be appropriately joined in a single indictment, defendant may move for severance of said counts for purposes of trial in the event that he is able to show such prejudice as might constitute a denial of his right to a fair trial, pursuant to Rule 14. *State v. Whitman*, 431 A.2d 1229 (R.I.1981); *State v. Sharbuno*, 120 R.I. 714, 390 A.2d 915 (1978); *State v. Patriarca*, 112 R.I. 14, 308 A.2d 300 (1973).

The standard that has been consistently applied in reviewing a trial justice's decision declining to sever counts pursuant to Rule 14 has been that of abuse of discretion. As we stated in *State v. Whitman:*

"In the final analysis, the granting or denial of a motion for severance is not a matter of right but one within the sound discretion of the trial justice. * * * The term 'discretion' connotes an action taken in the light of reason as applied to all of the facts and with a view to the rights of all parties to the action while having regard for what is right and equitable under all of the circumstances and the law." 431 A.2d at 1233.

In *State v. Whitman* we held that there was no abuse of discretion by the trial justice in declining to sever five counts that charged the defendant with the abominable and detestable crime against nature committed against five young men, all fifteen years of age or younger. We considered this severance in light of the doctrine first enunciated in *State v. Colangelo*, 55 R.I. 170, 179 A. 147 (1935), which held that evidence of other criminal acts would be excluded if offered simply to show a defendant's criminal propensity to commit the type of crime with which he is charged. *Colangelo* also recognized that evidence of other criminal acts would be admissible in order to show the defendant's guilty knowledge, intent, motive, design, plan, scheme, system, or the like. *See also State v. Delahunt*, 121 R.I. 565, 401 A.2d 1261 (1979); *State v. Jalette*, 119 R.I. 614, 382 A.2d 526

(1978). In *State v. Lemon,* 497 A.2d 713, 720 (R.I.1985), we noted that the *Colangelo* list of exceptions to admissibility of evidence of other crimes was not exhaustive and that proof of identity also constituted an exception to the similar crimes exclusion. *McCormick On Evidence,* § 190 at 557 (3d ed. Cleary 1984); *see also* 1 *Wharton's Criminal Evidence,* § 181 at 767 (14th ed. Torcia 1985).

In deciding the question of severance under Federal Rule 14 the court in *United States v. Miller,* 449 F.2d 974 (D.C.Cir. 1970), has held that the joinder of charges relating to separate robberies of liquor stores in the District of Columbia was not improper since evidence in support of the various counts not only tended to show a common scheme or plan but also "went to the issue of identity." *Id.* at 981.

Similarly, in *Johnson v. United States,* 356 F.2d 680 (8th Cir.1966), the court declined to disturb a trial judge's decision not to sever a five-count indictment under the Mann Act for transportation of various women for purposes of prostitution. The court commented that the counts referred to the same type of offense, occurring over a relatively short period, and that the evidence associated with each count would of necessity overlap. *Id.* at 682. The court further observed that denial of severance is not grounds for reversal "unless clear prejudice and abuse of discretion is shown. It is not enough simply to show that joinder makes it more difficult to defend." *Id.*

In the case at bar the offenses all occurred over a relatively short period from June to September during the year 1984. The crimes were sufficiently similar so as to show as much of a common scheme or plan as we found to exist in *State v. Whitman, supra,* or *State v. Sharbuno, supra. See also State v. Bernier,* 491 A.2d 1000 (R.I.1985) (sexual assault charges set forth in separate indictments were consolidated at trial).

In the instant case there would definitely have been an overlap in evidence regarding the taking of the confessions in relation to all five of these criminal charges. The confessions resulted from a single interrogation by the same police officers. It would have been difficult, if not impossible, to segregate the testimony regarding the taking of these confessions without creating confusion and unanswered questions in the minds of the jurors, if they heard a truncated version in respect to each offense, for the jurors must make the ultimate determination about voluntariness under Rhode Island law. Certainly the identity of this defendant was a common theme that would have to be determined in respect to each count of this indictment. As in *United States v. Miller, supra,* there would be not only a common scheme or plan but also the identity of defendant as an issue in each of the cases, making an overlap of evidence a necessity.

In respect to the possible confusion of the jurors by hearing all counts in a single trial, the evidence in this case was relatively simple and straightforward. The evidence in respect to each crime was also clearly separable and distinct and not likely to cause confusion or to be misunderstood with respect to the other crimes. *United States v. Miller,* 449 F.2d at 981. Moreover, the evidence in this case, in light of the confessions as well as the corroborating physical evidence, is nothing short of overwhelming. The likelihood that a different result would have been obtained in separate trials is remote and highly improbable.

■ The defendant further argues that had the counts been severed, he would have testified in respect to counts 3 and 4. He points out that as a result of the refusal to sever, he decided not to testify at all.

It is noteworthy that defendant did not point out to the trial justice or to us what his testimony would have been in respect to these counts—whether he would have denied his guilt or what effect this testimony could have had upon the ultimate result in respect to the various charges. The effect of this undescribed testimony is left wholly to speculation. He also gave no specific reasons why he wished to refrain from testifying in regard to the other counts.

The defendant suggests that his decision not to testify may have deprived him of his

constitutional right to present a defense. It must be borne in mind that defendant's decision not to testify in respect to any of the charges was his own tactical decision and was certainly not reached by virtue of any prohibition or preclusion placed on him by the trial justice or the prosecution. This vague and indefinite assertion does not establish the kind of prejudice to which we and other courts have alluded when defining the type of prejudice necessary to establish an abuse of discretion on the part of the trial justice in refusing severance under Rule 14 of the Superior Court Rules of Criminal Procedure or its federal counterpart. *See United States v. Park*, 531 F.2d 754, 763 (5th Cir.1976), wherein the court observed:

> " '[N]o need for a severance exists until the defendant makes *a convincing showing both that he has important testimony to give concerning one count and strong need to refrain from testifying on the other*. In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reason for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of "economy and expedition in judicial administration" against the defendant's interest in having a free choice with respect to testifying.' " (Emphasis added.)

We are of the opinion that the trial justice did not abuse his discretion in declining to grant defendant's motion to sever counts in this case.

## III

### DENIAL OF REQUEST FOR MISTRIAL

The defendant moved for a mistrial on three occasions during the course of the trial and once after the prosecution's closing arguments. These motions were denied. The defendant argues that these denials constituted reversible error.

A. The first motion was prompted by a reference by Detective Cross to "an incident in Westerly" in respect to which he had advised defendant of his *Miranda* rights and obtained an oral confession from him. No reference was made to the circumstances that underlay the "incident in Westerly".

The purpose of this testimony was to attempt to show that defendant understood the *Miranda* rights in respect to which he had been admonished concerning charges in Providence County that had been joined for trial in the case at bar. The defendant argued that any reference to "an incident in Westerly" would alert the jurors to the fact that he had committed another crime in addition to those crimes with which he was charged.

B. The second motion was based upon questions put to Michael E. Johnson, a Westerly police officer, concerning his prior giving of *Miranda* admonitions to defendant on April 12, 1980. This question was put to Officer Johnson in an attempt to show that defendant was familiar with the *Miranda* admonitions and would therefore probably be able to understand them. In the course of this interrogation, Officer Johnson stated, "I had several contacts with Mr. Lassor". At this juncture counsel for defendant moved to strike the comment and also moved for a mistrial. The trial justice gave a cautionary instruction but denied the motion.

C. Doctor Joy E. Pitterman was an expert witness presented by the state to establish defendant's ability to read and understand the admonitions contained in the *Miranda* form and also his ability to knowingly waive the rights contained therein. In the course of her testimony, the doctor testified that defendant said he had previously signed a *Miranda* form. Counsel for defendant moved for mistrial, claiming surprise at this testimony and arguing that it showed that defendant had had other contacts with the police. The trial justice denied the motion for mistrial.

We have stated that the decision concerning a declaration of a mistrial is within the sound discretion of the trial justice. *State v. St. Amant*, 536 A.2d 897 (R.I.1988); *State v. Fernandes*, 526 A.2d 495 (R.I.

1987); *State v. Collazo*, 446 A.2d 1006 (R.I. 1982); *State v. Anil*, 417 A.2d 1367 (R.I. 1980). In the event that the trial justice denies such a motion, his determination will be given great weight and will not be disturbed on appeal unless it is clearly wrong. *State v. Martellini*, 533 A.2d 527, 529 (R.I. 1987); *Collazo*, 446 A.2d at 1010; *State v. ·Pailin*, 114 R.I. 725, 729, 339 A.2d 253, 255 (1975).

We have also said that the determination of whether a prosecutorial comment or question is inflammatory or ineradicably prejudicial cannot be decided by a fixed rule of law. *State v. Brown*, 522 A.2d 208 (R.I.1987); *State v. Peters*, 82 R.I. 292, 107 A.2d 428 (1954). "The trial justice must evaluate the probable effect of the prosecutorial conduct on the outcome of the case by examining the remark or question in its factual context.* * * The test essentially is whether the prosecutorial comment or question so inflames the passions of the jury as to prevent their calm and dispassionate examination of the evidence." *State v. Brown*, 522 A.2d at 211; *State v. Verdone*, 114 R.I. 613, 337 A.2d 804 (1975); *State v. Mancini*, 108 R.I. 261, 274 A.2d 742 (1971).

Applying these guidelines to the three incidents upon which defendant based his motions for mistrial, we believe it is clear that the trial justice did not err in denying defendant's motions to pass the case. None of these references could be said to be so inflammatory as to prevent the calm and dispassionate examination of the evidence by the jurors.

The defendant cites *State v. Sepe*, 122 R.I. 560, 410 A.2d 127 (1980), and *State v. Colangelo*, 55 R.I. 170, 179 A. 147 (1935), as holding that it is improper to allow evidence of a crime other than the one charged in the indictment to show that a defendant is criminally disposed. It should be noted that both of these cases hold that the allusion to other crimes is improper when such evidence is irrelevant to the determination of an issue properly before the court. In the case at bar, defendant had raised the issue of his inability to understand *Miranda* admonitions. In respect

to this issue, it became relevant to determine whether defendant had had prior contact with such admonitions. Expert testimony by Dr. Pitterman indicated that such prior contact would have a significant bearing upon defendant's ability to understand the contents of the waiver form. As we suggested in *State v. Cline*, 122 R.I. 297, 405 A.2d 1192 (1979), a defendant does not have a right to be insulated against relevant testimony, even though that relevant testimony may tend to show additional criminal activity (in that instance, the crime of escape).

We are of the opinion that the evidence introduced through Detective Cross, Officer Johnson of Westerly, and Dr. Pitterman was relevant to the determination of a significant issue in the case and was therefore not a basis for the declaration of a mistrial. The defendant's appeal on this issue cannot be sustained.

## IV

## CHALLENGE TO TESTIMONY OF DETECTIVE FERREIRA, SERGEANT PEDCHENKO, AND DR. PITTERMAN

The defendant argues that the trial justice committed reversible error in admitting what he describes as "hearsay" testimony submitted by Detective Alfred A. Ferreira and Sergeant William Pedchenko, who testified concerning the *Miranda* admonitions they had heard as given by Detective Cross prior to the waiver of rights made by defendant. In support of his argument defendant cites *State v. Brash*, 512 A.2d 1375 (R.I.1986), wherein we held that inadmissible hearsay could not be used to bolster the testimony of a witness in a criminal case.

The short answer to this contention is that the testimony of Detective Ferreira and Sergeant Pedchenko did not constitute hearsay at all. The giving of *Miranda* admonitions is a verbal act. Testimony of a declarant who heard the *Miranda* admonitions is not introduced for the truth of the matter asserted but only to indicate that the words of admonition were given. These words have an independent legal ef-

fect upon the voluntariness of a statement given by a defendant. They bear a similarity to contractual words upon which persons rely in a civil context. *See McCormick on Evidence*, § 249 at 732. A witness who heard a *Miranda* admonition given may testify to the words used as he might testify to any act of which he has made a firsthand observation. Consequently, *State v. Brash* is wholly inapplicable. There is no rule that precludes the admission of corroborative testimony from a witness who has observed an event relevant to an issue in the case.

The defendant also objects to the testimony of Dr. Pitterman, who was accompanied to the Adult Correctional Institutions by two detectives when she tested defendant's ability to read the *Miranda* form. Specifically defendant objects to Dr. Pitterman's testimony that she was told by the detectives that defendant had read the form to them "in a similar fashion" when he was arrested but "read a little bit more slowly" for her than he had for them. This testimony also did not constitute hearsay since it was introduced solely to show the effect of the form upon defendant and its relevance to the voluntariness of the subsequent statements. *See McCormick on Evidence*, § 249 at 733–34.

Consequently, the trial justice was correct in allowing these statements into evidence as nonhearsay.

## V

## INSTRUCTIONS IN REGARD TO MANSLAUGHTER

The defendant argues that the trial justice committed reversible error in failing to give instructions that would allow the jury to find the lesser included offense of voluntary manslaughter committed in the heat of passion on adequate provocation, or voluntary manslaughter based upon diminished capacity.

It is true that counsel for the defense requested an instruction in respect to diminished capacity (request No. 11). This request did not mention the crime of manslaughter. The trial justice did, in his instructions, speak of diminished capacity in accordance with this request. The trial justice did not relate the element of diminished capacity to the crime of manslaughter.

Nevertheless, upon completion of the trial justice's instructions, the sole objection raised by counsel for the defense was to the failure of the trial justice to give his requested instruction on voluntary manslaughter committed "in a sudden heat of passion * * * caused by adequate legal provocation" (request No. 10). Defense counsel did not object to the failure to give an instruction on voluntary manslaughter based upon diminished capacity owing to intoxication or any other cause.

It has long been the rule in this state that a party may not assign as error any portion of a charge or omission therefrom unless he specifically directs the trial justice's attention to the matter to which he objects, and gives the ground for his objection. He not only must, in accordance with Rule 30 of the Superior Court Rules of Criminal Procedure, object to the charge as given, but must also articulate the challenge in such a fashion that the court is made aware of the exact nature of the alleged error, be it of commission or omission. *See, e.g., State v. Farlett*, 490 A.2d 52, 56 (R.I.1985); *State v. Rodriquez*, 478 A.2d 171, 174 (R.I.1984); *State v. Tarvis*, 465 A.2d 164, 170 (R.I.1983); *State v. Dionne*, 442 A.2d 876, 885 (R.I.1982). In the case at bar, defense counsel made no specific objection to the failure of the trial justice to instruct the jurors that they might find defendant guilty of voluntary manslaughter based upon diminished capacity. Consequently, defendant cannot now claim error on the part of the trial justice for having failed to give such an instruction.

Trial counsel, as indicated, did request an instruction on voluntary manslaughter committed "in a sudden heat of passion * * * caused by adequate legal provocation." The defendant now argues that this instruction should have been given with specific reference to the Carlucci murder since there was evidence from defendant's

statement that he had been provoked by his inability to achieve sexual consummation with the decedent, and his passion was therefore aroused. This argument is more astonishing than persuasive.

In *State v. Winston*, 105 R.I. 447, 452–53, 252 A.2d 354, 357 (1969), we outlined the historical development of the distinction between murder and manslaughter. We pointed out that in England voluntary manslaughter had evolved so as to require two elements:

A. The provocation must be so gross as to cause the ordinary reasonable man to lose his self-control and to use violence with fatal results.

B. The defendant must in fact have been deprived of his self-control under the stress of such provocation and must have committed the crime while so deprived.

To suggest that one who is attempting to commit a sexual assault upon a victim may be given the benefit of the defense of "adequate provocation" by reason of failure to consummate his illicit design is to propose a contradiction in terms. There was not one shred of evidence in this case that the victim had taken any action that constituted "adequate provocation". In attempting to fight off defendant, she was exercising, albeit unsuccessfully, her basic right of self-preservation. The defendant could not take advantage of her action to "convert his savagery into a lesser degree of homicide". *Winston*, 105 R.I. at 453, 252 A.2d at 358.

The trial justice did not err in declining defendant's proposed instruction in respect to voluntary manslaughter in the heat of passion and was not requested to instruct on the crime of manslaughter based on diminished capacity. We find no error in his instructing the jury as he did.

## VI

### JURY INSTRUCTIONS IN REGARD TO SEPARATE CHARGES

The defendant asserts error in the failure of the trial justice to give a requested instruction to the effect that each charge should be considered separately in respect to the principal charge and lesser included offenses.

An examination of the extensive instructions given by the trial justice discloses that he referred to each count of the indictment, defined the offenses set forth, and stated to the jury that each charge must be considered individually. The jury was also furnished with a verdict form upon which each count was set forth individually, along with possible lesser included offenses where applicable. The jurors were instructed to and did return separate verdicts on each count. Thus there seems little doubt that the court did in substance instruct the jury to consider each charge separately. Moreover, it is abundantly clear that the jurors did so.

It is the rule in this jurisdiction that when requested instructions are adequately covered by the trial justice's charge actually given to the jury, refusal to give the requested instruction is not error. *State v. D'Alo*, 435 A.2d 317 (R.I.1981); *State v. Sharbuno*, 120 R.I. 714, 390 A.2d 915 (1978); *State v. Casala*, 113 R.I. 690, 325 A.2d 540 (1974).

Since we find in the case at bar that the trial justice adequately covered the subject matter contained in defendant's requested instruction, there is no error in his having refused to give the instruction in the form submitted by defendant.

## VII

### THE MOTION TO SEQUESTER

At the commencement of trial, defendant moved to sequester all witnesses. The court granted the request with the exception of two detectives, Steven Cross and John McGehearty, who were allowed to remain present at counsel table in order to assist the prosecutor in presentation of the case. The defendant moved as an alternative that these two detectives be required to testify first. The court declined to exclude the detectives from the courtroom and further declined to require that they testify as the state's first witnesses. The defendant asserts this denial of his requests as error.

In *State v. Mathias*, 423 A.2d 484 (R.I. 1980), we considered this precise question and determined that the exclusion of witnesses from the courtroom during the taking of testimony at a trial is a matter vested in the sound discretion of the trial justice and that a decision in the exercise of that discretion will not be disturbed by this court "unless an abuse of that discretion clearly appears". *Id.* at 486; *State v. Raposa*, 100 R.I. 516, 517, 217 A.2d 469, 470 (1966); *State v. Cyrulik*, 100 R.I. 282, 284, 214 A.2d 382, 383–84 (1965).

In *Mathias* we applied the same standard in reviewing a trial justice's refusal to require that the police officer who was permitted to remain in the courtroom should testify first. We stated that the determination of the order of proof is within the discretion of the trial justice and that such discretion would not be lightly reviewed. 423 A.2d at 487. We also stated that it was unnecessary that the trial justice make a determination of the necessity of the assistance of the officer or officers who would be allowed to remain for the purpose of assisting the prosecution. *Id.* We saw no need to presume that the investigating officer or officers who assisted the prosecution are likely to modify their testimony in order to bring it into conformity with the testimony given by other witnesses. *Id.* at 488.

We believe that the principles enunciated in *Mathias* are dispositive of this issue. The trial justice committed no abuse of discretion in declining to exclude from the courtroom the two detectives assigned to assist state's counsel. We further find no abuse of discretion in not requiring the state to present these witnesses first.

## VIII

### STATE'S MOTION IN LIMINE

The defendant argues that his Sixth Amendment right of confrontation was violated by the trial justice's preclusion on the state's motion in limine of his intended cross-examination of the state's complaining witness, Carrie–Ann Talbot, in respect to her status as a runaway (she was then a juvenile) at the time of the commission of the alleged sexual assault upon her. On the ground of relevance, the trial justice forbade this cross-examination. The defendant cites the right of a defendant to cross-examine a witness for the purpose of establishing an interest, bias, or motive. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *State v. Anthony*, 422 A.2d 921 (R.I.1980). The short answer to this question is that the trial justice did not consider the status of the witness as a runaway as relevant to interest, bias, or motive. "Although an accused is guaranteed the right to effective cross-examination in all criminal matters, a trial justice must exercise discretion in determining the relevancy of proffered evidence and to protect a witness from questions that 'harass, annoy, or humiliate'." *State v. Burke*, 522 A.2d 725, 732–33 (R.I.1987); *see also Davis*, 415 U.S. at 320, 94 S.Ct. at 1112, 39 L.Ed.2d at 356; *Anthony*, 422 A.2d at 924. We discern no abuse of discretion in the trial justice's determination that the runaway status of the complaining witness had no relevance to interest, bias, or motive or any other legitimate issue in the case.

## IX

### THE CONSTITUTIONALITY OF THE RHODE ISLAND STATUTES THAT AUTHORIZE LIFE IMPRISONMENT WITHOUT PAROLE

The defendant challenges the constitutionality of the Rhode Island statutory structure that authorizes the imposition of the penalty of life imprisonment without parole on a number of grounds, some general and some specifically applicable to the procedures utilized in the instant case. These challenges require a general description and analysis of the statutes that authorize this particular punishment.

In 1984 G.L.1956 (1981 Reenactment) § 11–23–2 was amended to read in pertinent part as follows:

"Every person guilty of murder in the first degree shall be imprisoned for life. Every person guilty of murder in the first degree (1) committed intentionally while such person was engaged in the

commission of another capital offense or other felony for which life imprisonment may be imposed; or (2) committed in a manner creating a great risk of death to more than one person by means of a weapon or device or substance which would normally be hazardous to the life of more than one person; or (3) committed at the direction of another person in return for money or any other thing of monetary value from that person; or (4) *committed in a manner involving torture or an aggravated battery to the victim;* or (5) committed against any member of the judiciary, law enforcement officer, corrections employee, or fireman arising from the lawful performance of his official duties; or (6) committed by a person who at the time of the murder was committed to confinement in the adult correctional institutions or the state reformatory for women upon conviction of a felony, shall be imprisoned for life *and if ordered by the court pursuant to chapter 19.2 of title 12 such person shall not be eligible for parole from said imprisonment."* (Emphasis added.) P.L.1984, ch. 221, § 1.

During the same session of the General Assembly the Legislature enacted chapter 19.2 of title 12, which sets out the sentencing procedures which will be utilized in implementation of § 11-23-2. P.L.1984, ch. 362, § 2. These sentencing procedures may be generally described as follows. In all cases in which eligibility for imposition of the penalty of life imprisonment without parole may be invoked by the prosecution, the Attorney General must recommend in writing to the court within twenty days of the date of arraignment that such sentence be imposed. Thereafter, in the event that the jury returns a verdict of guilty of murder in the first degree, the trial justice must instruct the same jury to consider whether it has been proven beyond a reasonable doubt that the murder committed by the defendant involves one of the six circumstances enumerated in § 11-23-2. "If after deliberation the jury finds that one or more of the enumerated circumstances was present, it shall state in writing, signed by the foreman of the jury,

which such circumstance or circumstances it found beyond a reasonable doubt." Section 12-19.2-1.

Upon return of an affirmative verdict, identifying one or more of the six circumstances enumerated in § 11-23-2, the trial justice is required to conduct a presentencing hearing. At said hearing the court shall permit the Attorney General and counsel for the defense to present additional evidence relevant to a determination of the sentence to be imposed. Under the provisions of § 12-19.2-4 the trial justice must consider evidence regarding the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant, which are relevant to the sentencing determination. After hearing evidence and arguments regarding both aggravating and mitigating circumstances relating to the offense and the defendant, the court may in its discretion impose the sentence of life imprisonment without parole or a sentence of life imprisonment without such limitation. In either event the court must state on the record its reasons for imposing such sentence.

In all instances in which the trial justice imposes a sentence of life imprisonment without parole, the defendant has a right of appeal in respect to this sentence to this court, and this court has the obligation of exercising its own discretion in determining the appropriateness of such sentence. In effect this court must exercise its independent judgment after review of the transcript of the proceedings below and then either may ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment. Section 12-19.2-5.

The defendant first challenges this statutory structure on the ground that the absence of a specific provision for allowing defense counsel to argue to the jury on the question of whether one or more aggravating circumstances exist violated his right to counsel under the Rhode Island and United States Constitutions. It is of primary significance in this case that counsel for the defense did not seek permission of the

court to argue to the jury prior to its deliberation on the existence or nonexistence of an aggravating circumstance. He did not raise this issue before the trial justice until long after the jury had returned its finding that there was an aggravating circumstance, namely, "first-degree murder committed in a manner involving aggravated battery to the victim as to counts number 1 and 3".

Count 1 charged defendant with the murder of Lori Carlucci, and count 3 charged defendant with the murder of Delores Neuser. We shall deal with the specific application of this finding later in this opinion.

We have decided in numerous cases that we shall not consider an issue raised for the first time on appeal. *See, e.g., State v. D'Alo*, 435 A.2d 317 (R.I.1981); *Majewski v. Porter*, 121 R.I. 757, 403 A.2d 248 (1979). We have also said that claims of error "although briefed and argued at the appellate level, are deemed to have been waived if not effectively raised at trial". *State v. Burke*, 529 A.2d 621, 627 (R.I.1987); *State v. Rondeau*, 480 A.2d 398 (R.I.1984); *State v. Byrnes*, 433 A.2d 658 (R.I.1981). Since defendant did not request an opportunity for argument at a time when the trial justice could have considered that request and implemented it, it was not effective for him to raise a challenge at a later point in the proceeding when such request was manifestly ineffective since by that time the jury had already completed its deliberation and had been excused.

Nothing in the statute forbids granting counsel an opportunity to argue to the jury prior to its deliberation on the existence or nonexistence of an aggravating circumstance. We should certainly construe the statute as permitting such argument to be made. Indeed, we hold that both defense counsel and counsel for the state must be given the right to argue to the jury at that stage of the proceeding, if they wish to do so. However, in the absence of such a request, we cannot fault the trial justice for having instructed the jury without argument by either counsel.

It should also be noted that under the provisions of § 12–19.2–4 both counsel for the prosecution and the defense have an opportunity to present evidence and argue to the trial justice concerning the "aggravating and mitigating factors relating to the offense" so that the trial justice in essence exercises independent judgment regarding whether an aggravating circumstance was properly found to have existed. Consequently, the jury's determination even of the existence of an aggravating circumstance is not final.

The defendant also challenges the constitutionality of § 11–23–2 in that it fails to provide a definition of the term "aggravated battery." He suggests that this failure violates due process in that the term is vague and would invite the trier of fact to make an arbitrary or capricious finding. For this proposition he cites *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). We must disagree.

In evaluating the Rhode Island sentencing procedures in regard to imposition of the sentence of life imprisonment without parole, we must not equate this penalty with that of death, concerning which the Supreme Court of the United States has applied a unique analysis. Cases involving the death penalty are of limited usefulness in assessing the constitutionality of a sentence of a term of life imprisonment without parole. *See Commonwealth v. Diatchenko*, 387 Mass. 718, 443 N.E.2d 397 (1982). The unique quality of the death penalty has frequently been noted by the United States Supreme Court. In *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed. 2d 973, 990 (1978), the plurality described the death penalty as "profoundly different from all other penalties." Again in *Lockett* it was stated that the standards for evaluating the constitutionality of death-penalty provisions are much higher than the standard to be employed in evaluating other penalties. In *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed. 2d 382, 390 (1980), the Court observed that "[b]ecause a sentence of death differs in kind from any sentence of imprisonment, *no matter how long*, our decisions [in death-penalty cases] are of limited assistance in deciding the constitutionality of

[other punishments, including the life sentence imposed] on Rummel." (Emphasis added.)

Even though death-penalty decisions are of limited precedential effect, it is appropriate to note that even in such a context the term "aggravated battery" has never been determined by the United States Supreme Court to be facially unconstitutional for vagueness. Indeed, in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the plurality specifically addressed a challenge to the seventh aggravating circumstance set forth in the Georgia death-penalty statute (*inter alia,* involving "an aggravated battery"). The Court observed: "It is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." *Id.* at 201, 96 S.Ct. at 2938, 49 L.Ed.2d at 890. *See also Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), in which statutory language setting forth an aggravating circumstance as "outrageously vile, horrible or inhumane" was found vague in its application to a murder in the absence of "torture or aggravated battery". Consequently, the term "aggravated battery" has been recognized by the United States Supreme Court, as well as by the Supreme Court of Georgia, as indicating that it constitutes the malicious causing of bodily harm to another by depriving him of a member of his body or by rendering a member of his body useless or by seriously disfiguring his body or a member thereof. *Godfrey,* 446 U.S. at 431–32 n. 13, 100 S.Ct. at 1766 n. 13, 64 L.Ed.2d at 408 n. 13. The Supreme Court of the United States in *Godfrey* construed "aggravated battery" in pari materia with "torture" as applied by the Georgia Supreme Court so as to require evidence of serious physical abuse of the victim before death. As a consequence, we are of the opinion that a term that has passed the intense scrutiny given in death-penalty cases should certainly not be considered unconstitutionally vague for the imposition of the sentence of life imprisonment without parole.

The defendant also has raised the question of his inability to have the jury consider mitigating circumstances. This claim is completely without merit because, unlike that in Georgia, the sentencing authority in this state is the trial justice, not the jury. The trial justice is directed by statute to consider mitigating circumstances as well as the aggravating circumstance or circumstances found by the jury and by the trial justice to have been proven beyond a reasonable doubt. The trial justice is in no way bound by the threshold determination of the jury. The jury's finding that an aggravating circumstance has been proven beyond a reasonable doubt merely triggers the inquiry by the trial justice into the suitability of the imposition of this penalty. There would be no point in asking the jury to consider mitigating circumstances when it has no authority to impose or withhold the sentence of life imprisonment without parole.

Every opportunity is given to counsel and to the defendant to argue to the court and to exercise the defendant's right of allocution. In the case at bar, defendant was offered the opportunity to make a statement to the court prior to sentencing, but he declined to do so. It is a well-settled principle of constitutional law that a statute duly enacted by the General Assembly is presumed to be constitutional. A party who challenges constitutionality must sustain the burden of proving the statute to be unconstitutional beyond a reasonable doubt. *Cardi Corp. v. State,* 524 A.2d 1092, 1097 (R.I.1987); *Santini v. Lyons,* 448 A.2d 124, 126 (R.I.1982); *State v. Capone,* 115 R.I. 426, 432–33, 347 A.2d 615, 619 (1975); *In re Buxton,* 111 R.I. 480, 483, 304 A.2d 350, 352 (1973). Our analysis of the statute clearly indicates that defendant has failed to sustain the burden of establishing unconstitutionality beyond a reasonable doubt. Therefore, his challenge on this ground must be rejected.

## X

## THE CHALLENGE TO THE IMPOSITION OF THE PENALTY IN THIS CASE

The defendant argues that it was inappropriate for the trial justice to impose the

two sentences of life imprisonment without parole in respect to counts 1 and 3 of the indictment. The defendant argues that although he is a person of limited abilities, he is young and can be rehabilitated, and therefore there is no need for the imposition of the additional sanction in this case. We must reject this argument. The defendant was found to be fully capable of responding to the criminal process after consideration of expert testimony on the issue of competency prior to trial. There is no question that the jury and the trial justice properly found that the circumstance of aggravated battery existed in respect to these two charges. In regard to the murders of Carlucci and Neuser, the record discloses shocking brutality in both cases.

The defendant beat Carlucci into unconsciousness, strangled her (fracturing both larynx and hyoid bone in multiple sites), and then forcefully inserted a plywood stick into her rectum with such force and so deeply that the medical examiner at first was led to believe that her clavicle had been fractured. In the defendant's own words in his statement to the police:

> "Then I grabbed her by the neck with my both hands and strangled her but she was still alive and I dragged her out of the car and I laid her on the ground and she was unconscious. I hit her some more and then hit her with my fists some more. I don't know how many times I hit her. I then pulled her pants off and pulled her underwear down. I saw a thin plywood stick on the ground and I took the stick and I shoved it up her ass. She screamed when I shoved the stick up her ass. I got into my friend's car and left."

After the murder of Neuser, the "autopsy demonstrated injuries indicative of manual strangulation and severe injuries and fractures of the face and scalp resulting in extensive hemorrhage." There were also injuries of the lower abdomen resulting in bladder separation and laceration of the small bowel and mesentery with internal hemorrhage. She died "as a result of asphyxia due to strangulation and blunt force trauma [to] the face, * * * head and lower abdomen."

If there has ever been a case in which an aggravated battery was committed upon a victim with such savagery as to constitute serious physical abuse of the victim before death, it has certainly been proven beyond a reasonable doubt in this case in respect to Lori Carlucci and Delores Neuser.

In the exercise of our independent judgment and discretion, we affirm the sentence of life imprisonment without parole imposed upon this defendant in respect to counts 1 and 3 of the indictment.

## XI

### OTHER ISSUES

The defendant has raised a number of other issues involving evidentiary rulings by the trial justice in respect to both lay witnesses and expert witnesses. These rulings were based upon relevance or the foundation necessary to establish relevance. We have carefully examined the record of these rulings, the contexts in which they were made, and the arguments presented below, as well as those presented by the defendant and counsel for the state on appeal. We are of the opinion that all the rulings came well within the discretion granted to a trial justice under our prior cases.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgments of conviction are affirmed, and the imposition of the sentence of life imprisonment without parole is affirmed. The papers in the case may be remanded to the Superior Court.