**STATE**

v.

**Gene E. TRAVIS.**

**No. 87–313–C.A.**

Supreme Court of Rhode Island.

Jan. 9, 1990.

James E. O'Neil, Atty. Gen., Annie Goldberg, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on the appeal of the defendant Gene E. Travis from a conviction of murder in the first degree and the imposition by the trial justice of a sentence of life imprisonment without parole pursuant to G.L.1956 (1981 Reenactment) § 11–23–2, as amended by P.L.1984, ch. 221, § 1. We affirm both the conviction and

the sentence. The facts of the case insofar as pertinent to this appeal are as follows.

On December 10, 1985, at about 5:45 p.m., a store owner named Michael Siravo noticed a dark-colored Chevrolet Monte Carlo automobile of apparently early 1970's vintage parked in a lot shared by three stores in a shopping plaza located in the town of North Kingstown. Shortly thereafter Mr. Siravo observed this same automobile leaving the parking lot at high speed and traveling in a general northerly direction. A few minutes later he heard sounds emanating from the vicinity of the shoe store next door. He noticed that the lights were still on in the shoe store even though the owner Janice Pinelli normally would have closed her store by that time of day. As he walked closer, Siravo could see Mrs. Pinelli through the window. She was standing in the middle of the store and there was blood on her face. He rushed in, told her that he would call the police, and ran back to his store to do so. When he returned to the shoe store, he saw Mrs. Pinelli lying on her side in a pool of blood. Her hands were tied behind her back, her clothing was bloodstained, and she kept repeating, "I am going to die," and "I can't breathe." Thereafter, Mrs. Pinelli was taken to the Kent County Memorial Hospital by a rescue squad. She later died that same night of multiple stab wounds.

Shortly after Mr. Siravo's call, Officer John Fulford of the North Kingstown police came to the scene. He was met by Mr. Siravo, who informed him of the dark-colored Monte Carlo that had just left the parking lot. Officer Fulford notified headquarters that they should be looking for a dark-colored, early-model Monte Carlo automobile which had sped off in a northerly direction on Post Road. He also notified headquarters that a crime of attempted murder had been committed at the shoe store.

As a result of the radio broadcast from North Kingstown police headquarters, police in East Greenwich and North Kingstown stopped at least two cars that appeared to be early-model Monte Carlos.

Each car was examined by Mr. Siravo and then released.

Patrolman Geoffrey Rinn of the East Greenwich police was on patrol in that town when he received a broadcast from his headquarters describing the Monte Carlo vehicle. The officer had also received a more detailed description from a North Kingstown police officer when Rinn had earlier stopped a Cadillac El Dorado. This description included the fact that the dark Monte Carlo had a white top and was operated by a male driver. At that point Rinn was traveling on First Avenue and noted an older-model Monte Carlo pass him heading in the opposite direction. His attention was riveted to this automobile because it seemed to fit the description he had received through the broadcast and also from the additional information that had been given to him by Officer Maciel of North Kingstown. Officer Rinn turned his car around and headed east. He lost sight of the Monte Carlo briefly because of a rise in the road, but when he came over the hill, he saw the Monte Carlo, registration No. GO 657, stopped by the side of the road. The driver's door was open and the engine was running. A man was standing next to the car, having apparently just emerged from it. He was tall, he looked gaunt, and his clothing was disheveled. He was also bleeding from a cut on his right cheekbone.

Believing that this individual was the person who had committed the attempted murder, Officer Rinn placed him under arrest. This encounter took place at about 6:40 p.m. (approximately thirty minutes after Officer Rinn heard the radio report). Other officers came to the scene after the suspect had been patted down for weapons and put into Rinn's patrol car. The suspect, who was later identified as defendant Gene Travis, was transported to the police station where he was thoroughly searched. From his person the police seized a wad of folded currency in the amount of $219 as well as forty-three quarters and other change. They believed this money had been taken from the shoe store cash register, which had been found to be empty when the police arrived. There is some question whether the quarters may have

been derived from other criminal conduct not connected with the murder and robbery of Mrs. Pinelli. More significantly, the police found in defendant's pocket a diamond ring. This ring was later identified by Stanley Pinelli, husband of the victim, as the property of his wife. From the car, which was searched pursuant to a warrant, the police seized a length of white extension cord whose ends appeared to fit a piece of similar cord used to bind Mrs. Pinelli's hands behind her back. Moreover, defendant at the time of his arrest was wearing a red sweater, whose fibers police discovered were similar to fibers found on the heel of a woman's black shoe found on the floor of the storage room of the shoe store. In the same storage room police found a blue button that matched the buttons on defendant's shirt.

Although the police searched the store, the Monte Carlo automobile and the surrounding area for evidentiary items, they found no weapon that could have inflicted the wounds suffered by Mrs. Pinelli. The police in the search of the store found signs that a struggle had occurred in the back storage room. There was blood on the floor, and chairs had been thrown around. There were bloodstains on the wall, on the floor of the main room, on the outside and inside doors, and on the cash register counter. As previously mentioned, the cash register was empty, but Mrs. Pinelli's pocketbook containing $179 in cash and $352.80 in checks, remained undisturbed in the store in the course of the attack and robbery.

The medical examiner later determined that twenty-three stab wounds had been inflicted upon Mrs. Pinelli, twenty of them over the chest and abdomen, including two to the heart, one small wound to the left lung, multiple penetrating through-and-through wounds to the stomach and wounds to the left lobe of the liver, to the pancreas, beneath the stomach to the left kidney, to the left eye, and on the neck. She also suffered a fracture of the left fifth rib associated with the wound of the chest and heart and a large gaping wound medial to the breast.

Many of these wounds were squared at one end. The medical examiner testified that this suggested a blunt edge of a knife or, as he mentioned on cross-examination, the weapon could have been a screwdriver.

In support of his appeal defendant raises three issues that will be considered in the order in which they appear in defendant's brief. Further facts will be supplied as needed in order to consider these issues.

## I

### WHETHER OFFICER RINN HAD PROBABLE CAUSE TO ARREST DEFENDANT?

The defendant argues that the initial arrest by Officer Rinn was invalid as a result of its having been made without probable cause. He further argues that the items seized in the later search of the automobile pursuant to a warrant were also inadmissible as the fruits of the initial arrest. We begin our inquiry with the findings of fact made by the trial justice, who determined that there was probable cause for the arrest. The trial justice found that Officer Rinn received a description of a vehicle that had left the scene of an attempted murder in North Kingstown. The North Kingstown police department had broadcast a description, and the East Greenwich police department's dispatcher relayed the description to the East Greenwich police. Later Officer Rinn received a further description of the vehicle from Officer Maciel of the North Kingstown police department. He found that the description was specific in regard to the make of the car (Chevrolet Monte Carlo), and to the facts that it was of a dark color with a light top, that it was an older car and was headed north on Post Road toward East Greenwich, and that it had a male operator. The trial justice summarized his findings as follows:

"Therefore, the Court finds that the description of the car was sufficiently specific and accurate to allow Officer Rinn to rely thereon. Furthermore, his presumption that the male standing by the car had been the operator of the car was reasonable. The above, coupled with de-

fendant's disheveled appearance, could lead a reasonable person to believe that the defendant, as the presumed operator of the vehicle described, had been involved with the attempted murder in North Kingstown."

The trial justice went on to hold that Officer Rinn had probable cause to arrest defendant and that the subsequent searches of defendant and the car were legal as searches incident to the arrest. In passing upon this issue, we follow the same standard applied by the trial justice that an arrest without a warrant may be made only upon probable cause. *State v. Brennan*, 526 A.2d 483, 485 (R.I.1987); *State v. Baton*, 488 A.2d 696, 700 (R.I.1985). Probable cause to arrest has been defined in numerous cases as consisting of those facts and circumstances within the police officer's knowledge at the moment of arrest and of which he has reasonably trustworthy information that would warrant a reasonably prudent person's believing that a crime has been committed and that the prospective arrestee had committed it. *State v. Adams*, 481 A.2d 718, 728–29 (R.I.1984). This factual requirement has been described as a mosaic of facts and circumstances that should be viewed cumulatively "as through the eyes of a reasonable and cautious police officer on the scene, guided by his or her experience and training." *In re Armand*, 454 A.2d 1216, 1218 (R.I.1983) (quoting *In re John C.*, 425 A.2d 536, 538–39, *cert. denied*, 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1005 (1981)). There is, of course, a significant difference between the quantum of evidence necessary to establish probable cause and that necessary to establish proof of guilt. *In re Armand*, 454 A.2d at 1218; *State v. Welch*, 441 A.2d 539, 541 (R.I.1982). For parallel holdings by the Supreme Court of the United States, *see, e.g., Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct.1975, 26 L.Ed.2d 419 (1970); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

In *In re Armand*, 454 A.2d at 1218, we emphasized that knowledge of the fact that a crime had actually been committed was an important element in determining probable cause. *See State v. Frazier*, 421 A.2d 546, 550 (R.I.1980). We also cautioned in *Armand* that a finding of probable cause in any given case rarely furnishes a formula for making similar findings in other cases because probable cause depends upon the facts and circumstances of the particular case being reviewed. 454 A.2d at 1218. Consequently we have no intention of distinguishing the various cases from other jurisdictions that the defendant has cited on this issue of probable cause. Our own cases and those of the United States Supreme Court furnish adequate guidance to reach a determination of this issue.

It is our obligation in dealing with this question to exercise our independent judgment on this constitutional analysis while giving reasonable deference to the findings of historical fact made by the trial justice. *Ker v. California*, 374 U.S. 23, 32, 83 S.Ct. 1623, 1629, 10 L.Ed.2d 726, 737 (1963); *State v. Jenison*, 442 A. 2d 866, 872 (R.I.1982).

Viewing the facts surrounding this arrest in light of standards enunciated in the cited cases, we hold in the exercise of independent judgment that the facts as found by the trial justice unerringly point to the conclusion that Officer Rinn had probable cause to believe that the operator of this vehicle, as he stood beside the vehicle bleeding from a gash on the cheek, was the person previously described as having fled the scene of the crime of attempted murder. Officer Rinn had information of the utmost reliability that a crime of attempted murder had been committed. He had the description of a rather singular vehicle operated by a male who was found in the vicinity of the crime and headed northward as previously reported and matching the description given. The fact that the suspect was bleeding would support an inference that he had recently been involved in a violent encounter.

The defendant argues with more ingenuity than persuasiveness that other cars registered in Rhode Island may also have been Monte Carlo automobiles of a similar

color. This might be of significance if one were dealing with an issue of proof beyond a reasonable doubt but not of probable cause. By its very definition the possibility of error is always inherent in the determination of probable cause. It is simply a threshold requirement for invading a suspect's right to privacy. There was ample evidence to justify the intrusion upon the privacy of this defendant as he stood bleeding beside his rather specifically described automobile shortly after a bloody crime had been committed.

Consequently we are of the opinion that the trial justice did not err in finding probable cause and in denying defendant's motion to suppress the fruits of the initial search as well as the later search based upon the issuance of a warrant.

## II

### DENIAL OF DEFENDANT'S MOTION IN LIMINE

■ The defendant urges that the denial of his motion in limine to exclude the testimony of Mrs. Eleanor King as a witness constituted prejudicial error. This argument must be considered in the context that the state presented several witnesses who testified that they saw the Monte Carlo being driven by someone who resembled defendant during the period surrounding the attack and robbery of Mrs. Pinelli. One of these witnesses was Eleanor King, who stated that she was walking along a dirt road near its intersection with Post Road at about 4:45 p.m. on the evening that the crime took place. She also testified that she was walking her husband's guide dog (her husband was handicapped) and that the automobile came by rather swiftly, almost sideswiping the dog. The only pertinent observation Mrs. King made was that this was a dark older-model car with a license plate whose numbers were preceded by the letters "GO". Other evidence had established that the license plate of the car defendant was driving was "GO 657". Other than this observation, Mrs. King was unable to identify the vehicle or its driver. The defendant argues that the testimony of this witness, though of little relevance, tended to inflame the passions of the jury by indicating that he might drive his automobile in such a fashion as to endanger the safety of a handicapped person's guide dog. We have earlier stated that evidence sufficient to bring about a mistrial or to vitiate a conviction should be of a type that would cause the jurors to become so inflamed as to distract their attention from the true issues in the case. *State v. Brown,* 522 A.2d 208, 210–11 (R.I. 1987).

This evidence was clearly not of that magnitude of prejudice. Indeed, the witness did not indicate that the automobile was driven at an excessive speed, but simply that it was going more quickly than would be expected if one considered the nature of this dirt road. To suggest that such equivocal testimony would tend to inflame the passions of the jury in this case, particularly if one takes into account the serious nature of the crime with which defendant was charged, is to stretch the bounds of credulity. Although we agree that the testimony was of limited relevancy, taking into account the innocuous nature of Mrs. King's observation and the overwhelming evidence of guilt presented by the state, we do not believe that the denial of the motion in limine and the admission of this testimony were significantly prejudicial to defendant.

Since the determination of relevance is a matter left to the sound discretion of the trial justice and since this evidence did bear to some extent upon the issue of defendant's presence in the vicinity where the crime was committed and within a time frame of approximately one hour, we cannot say that admission of this evidence constituted an abuse of discretion.

## III

### VALIDITY OF THE IMPOSITION OF THE SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE

As we pointed out in *State v. Lassor,* 555 A.2d 339 (R.I.1989):

"In 1984 G.L.1956 (1981 Reenactment) § 11–23–2 was amended to read in pertinent part as follows:

'Every person guilty of murder in the first degree shall be imprisoned for life. Every person guilty of murder in the first degree (1) committed intentionally while such person was engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed; or (2) committed in a manner creating a great risk of death to more than one person by means of a weapon or device or substance which would normally be hazardous to the life of more than one person; or (3) committed at the direction of another person in return for money or any other thing of monetary value from that person; or (4) *committed in a manner involving torture or an aggravated battery to the victim;* or (5) committed against any member of the judiciary, law enforcement officer, corrections employee, or fireman arising from the lawful performance of his official duties; or (6) committed by a person who at the time of the murder was committed to confinement in the adult correctional institutions or the state reformatory for women upon conviction of a felony, shall be imprisoned for life *and if ordered by the court pursuant to chapter 19.2 of title 12 such person shall not be eligible for parole from said imprisonment.* (Emphasis added.) P.L.1984, ch. 221, § 1.'

"During the same session of the General Assembly the Legislature enacted chapter 19.2 of title 12, which sets out the sentencing procedures which will be utilized in implementation of § 11–23–2. P.L.1984, ch. 362, § 2. These sentencing procedures may be generally described as follows. In all cases in which eligibility for imposition of the penalty of life imprisonment without parole may be invoked by the prosecution, the Attorney General must recommend in writing to the court within twenty days of the date of arraignment that such sentence be imposed. Thereafter, in the event that the jury returns a verdict of guilty of murder in the first degree, the trial justice must instruct the same jury to consider whether it has been proven beyond a reasonable doubt that the murder committed by the defendant involves one of the six circumstances enumerated in § 11–23–2. 'If after deliberation the jury finds that one or more of the enumerated circumstances was present, it shall state in writing, signed by the foreman of the jury, which such circumstance or circumstances it found beyond a reasonable doubt.' Section 12–19.2–1.

"Upon return of an affirmative verdict, identifying one or more of the six circumstances enumerated in § 11–23–2, the trial justice is required to conduct a presentencing hearing. At said hearing the court shall permit the Attorney General and counsel for the defense to present additional evidence relevant to a determination of the sentence to be imposed. Under the provisions of § 12–19.2–4 the trial justice must consider evidence regarding the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant, which are relevant to the sentencing determination. After hearing evidence and arguments regarding both aggravating and mitigating circumstances relating to the offense and the defendant, the court may in its discretion impose the sentence of life imprisonment without parole or a sentence of life imprisonment without such limitation. In either event the court must state on the record its reasons for imposing such sentence.

"In all instances in which the trial justice imposes a sentence of life imprisonment without parole, the defendant has a right of appeal in respect to this sentence to this court, and this court has the obligation of exercising its own discretion in determining the appropriateness of such sentence. In effect this court must exercise its independent judgment after review of the transcript of the proceedings below and then either may ratify the imposition of the sentence of life imprisonment without parole or may reduce the

sentence to life imprisonment. Section 12–19.2–5." 555 A.2d at 351–52.

## A

█ The defendant challenges the trial justice's failure to define for the jury the terms "torture" and "aggravated battery". In responding to a claim of facial unconstitutionality, we had stated in *State v. Lassor*, 555 A.2d at 354, that the Supreme Court of the United States in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), applying the more exacting standard of review utilized in death penalty cases, had declined to hold that "aggravated battery" was unconstitutionally vague. We also pointed out that the Court in *Godfrey v. Georgia*, 446 U.S. 420, 431–32 n. 13, 100 S.Ct. 1759, 1766 n. 13, 64 L.Ed.2d 398, 408 n. 13 (1980), had "construed 'aggravated battery' in pari materia with 'torture' as applied by the Georgia Supreme Court so as to require evidence of serious physical abuse of the victim before death." *Lassor*, 555 A.2d at 354.

In quoting from these cases involving the death penalty, we did not imply that identical definitions would be required for the application of the statutory penalty of life imprisonment without parole. Indeed, we stated very clearly in *Lassor* that this penalty must not be equated with that of death and that cases involving the death penalty are of limited usefulness in assessing the constitutionality of this statute. 555 A.2d at 353.

This case presents to us for the first time the question of whether it is incumbent upon a trial justice to define the term "aggravated battery" and the term "torture", particularly when a defendant, pursuant to Rule 30 of the Superior Court Rules of Criminal Procedure, has not requested such an instruction by the close of the evidence.

The defendant takes the position that an aggravating circumstance pursuant to the terms of § 11–23–2 is substantially synonymous with an element of a crime that must be defined, whether requested or not, pursuant to our holding in *State v. Robalewski*, 418 A.2d 817 (R.I.1980). We are of the opinion that the definition of aggravating circumstances within § 11–23–2 is not to be equated with the definition of the elements of a crime.

In Rhode Island, as in many other jurisdictions, the imposition of any sentence has historically been the function of the trial justice. Normally the jury does not have a role in the imposition of sentences. In the case of life imprisonment without parole, however, the Legislature has given the jury the function of triggering the analysis by the trial justice through finding one or more aggravating circumstances enumerated in § 11–23–2. This determination takes place after a defendant has been found guilty of the crime of murder in the first degree. This determination does not implicate the elements of the crime but is a determination relevant only to the imposition of the sentence ultimately to be made by the trial justice.

In our opinion, even though we would not discourage a trial justice from assisting the jury with illustrative definitions of the words "aggravated battery" and "torture," we find that these words are not esoteric, nor are they in this context words of art.

The word "torture" is defined in *The American Heritage Dictionary*, 1280 (2nd Ed.1982) as meaning "[t]he infliction of severe physical pain as a means of punishment or coercion." The word "aggravate" is defined as meaning "[t]o make worse or more troublesome," *id.* at 87, and the term "battery" is described as meaning "[t]he act of beating or pounding." *Id.* at 162. We believe that these words are in common usage and convey to a juror of ordinary intelligence an image of a beating or infliction of traumatic force that is greater than necessary in order to render a victim helpless or to subject the victim to the will of the aggressor. The term "torture," when considered in context with the words "aggravate" and "battery," would convey a similar meaning of inflicting pain and traumatic force beyond that which would ordinarily be expected even in the case of homicide. A judicial rendering of these definitions probably would not significantly enhance the understanding of the ordinary intelligent juror but would only articulate

the impression which the words themselves would convey.

In the Commonwealth of Massachusetts the meanings of the words "atrocity" and "cruelty" have long been left to the discretion of the jury without a legal definition. *See, e.g., Commonwealth v. Lacy,* 371 Mass. 363, 358 N.E.2d 419 (1976); *Commonwealth v. Devlin,* 126 Mass. 253 (1879). Such words as "atrocity" and "cruelty" are in common usage as are the words "aggravated battery" and "torture".

We believe that we cannot extol the virtues of trial by jury as has been done with almost lyrical eloquence in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and then make the assumption that jurors are unable to understand words that are in common, everyday use.

Consequently we are of the opinion that the failure to define the terms "torture" and "aggravated battery" did not constitute error that would invalidate the finding of that aggravating circumstance by the jury.

## B

■ The defendant further argues that the finding by the jury that he committed felony murder could not lawfully be used as an aggravating circumstance. This argument ignores the statutory provision which includes among the aggravating circumstances:

"(1) committed intentionally while such person was engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed." Section 11–23–2.

In answer to a question propounded by the jury in the case at bar, the trial justice instructed the jury that robbery was a crime for which life imprisonment might be imposed. The jury found in its original verdict that this murder was committed while defendant was perpetrating or attempting to perpetrate the crime of robbery. The jury then found in its supplemental enumeration of aggravating circumstances that this murder was "committed intentionally while such person was engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed." This finding was expressed in terms identical to the statutory language. The defendant appears to argue that the General Assembly did not have the authority to provide for enhancement of the penalty beyond that ordinarily provided for first-degree murder in light of a finding of the substantial equivalent of the crime of felony murder. With this proposition we must respectfully disagree.

Indeed in many of the death penalty statutes, an aggravating circumstance will consist of committing the crime of murder while engaged in enumerated felonies including robbery. *See, e.g., Proffitt v. Florida,* 428 U.S. 242, 248–49 n.6, 96 S.Ct. 2960, 2965 n.6, 49 L.Ed.2d 913, 921 n.6, (1976); *Gregg v. Georgia,* 428 U.S. 153, 165 n.9, 96 S.Ct. 2909, 2921 n.9, 49 L.Ed.2d 859, 870 n.9 (1976). In Arizona one of the aggravating circumstances is murder committed for pecuniary gain. Such an aggravating circumstance has been held by Arizona's Supreme Court to fit the definition of a murder committed in the course of a robbery wherein something of monetary value was taken from the victim. *See Poland v. Arizona,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986). The Legislature has broad powers to determine the punishment that may be imposed by the court, *see Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), and generally it is only in the field of the death penalty that stringent limiting standards have been imposed. Even in that context, however, states have been permitted to define aggravating circumstances as including conduct that may readily be applied to murder in the course of the commission of a robbery.

As a consequence we hold that there is no constitutional limitation upon the power of the Legislature to define one of the aggravating circumstances as murder committed in the course of a robbery, even though such a definition would be applicable to felony murder.

C

The defendant argues that the statute which authorizes life imprisonment without parole fails to define aggravating and mitigating circumstances. We must respectfully disagree in regard to aggravating circumstances. Indeed, § 11–23–2 defines aggravating circumstances with as much particularity as is found in the death penalty statutes considered in *Proffitt v. Florida, supra,* and *Gregg v. Georgia, supra.* In pointing out this fact, we do not suggest that the Rhode Island Legislature in adopting a statute authorizing life imprisonment without parole is subject to the same limitations and requirements as if it had enacted a death penalty statute.

██ In regard to mitigating circumstances, we would point out that in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held invalid an attempt to define mitigating circumstances as including only certain statutory factors. In that case the Court held that mitigating circumstances could not be so narrowly circumscribed and that the need for individualized sentences in death penalty situations required that such a statute must not preclude consideration of any relevant mitigating factor that the defendant chooses to present. *Id.* at 604–606, 98 S.Ct. at 2964–65, 57 L.Ed.2d at 989–90. Again, although we are of the opinion that death penalty cases are not controlling in respect to our statute, we are persuaded that a defendant should be given the opportunity to present any reasonably relevant factors as mitigating circumstances to the trial justice. The trial justice may then determine whether such mitigating circumstances should result in his or her declining to impose the penalty of life imprisonment without parole. In the case at bar there is no claim that the trial justice refused to consider any mitigating circumstances proffered by defendant.

Consequently defendant's argument on this issue can furnish no basis for relief from the imposition of his sentence.

D

██ The defendant urges the court to reduce the penalty from life imprisonment without parole to life imprisonment. In passing upon this request, we have the obligation to examine the record as the trial justice has done and to exercise our independent judgment in respect to the aggravating circumstances found by the jury and adopted by the trial justice and to consider these aggravating circumstances together with any matter in mitigation. We must also consider the personal history, character, record, and propensities of defendant that are relevant to the sentencing determination. We begin this analysis by examining the findings of the trial justice. After hearing the arguments of counsel, the trial justice made the following statement in imposing the sentence of life imprisonment without parole:

"[The jury] found the murder to have been committed intentionally while such person was engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed and committed in a manner involving torture or an aggravated battery to the victim.

"I adopt their finding, and I find that the crime was committed intentionally while such person was engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed and committed in a manner involving torture or an aggravated battery to the victim. The manner in which and the means by which Mrs. Pinelli met her death establishes that it was committed intentionally while such person was engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed and committed in a manner involving torture or an aggravated battery to the victim, and the evidence overwhelmingly supports that conclusion. * * *

"I find mitigating factors absent in this hearing. I do find aggravating factors present. I do have the benefit of the presentence report, and I find that the defendant's background reveals an extremely limited employment record;

that he has embarked on a wave of criminal activity; that he has spent most of his adult life incarcerated for crimes of violence, such as the one for which he is being sentenced; that when Mrs. Pinelli's life was extinguished, the defendant had been released from prison barely five weeks. This was a brutal murder, accompanied by torture and aggravated battery."

From our examination of the record in this case, we are of the opinion that the evidence overwhelmingly supports the finding both of the jury and of the trial justice. It is obvious that the crime of murder was committed in the course of the crime of robbery. That this was not an intentional crime in the light of the evidence in this case is impossible to accept. None of the findings by the jury in the course of determining guilt or innocence were in any way inconsistent with the finding which they ultimately made that this was a murder committed intentionally while such person was engaged in the commission of another capital offense or other felony for which life imprisonment might be imposed, namely, robbery. Any other finding in the circumstances would have been irrational.

In respect to the finding that the murder was committed in a manner involving torture or aggravated battery to the victim, the evidence is again overwhelmingly supportive of this finding. This victim was subjected to twenty-three stab wounds, which injuries have been set forth in detail earlier in this opinion. One of the wounds almost amputated one of the victim's breasts. The fracture of her left fifth rib was associated with a wound of the chest and heart. The evidence in this case indicates a savage attack executed with extreme brutality. Certainly the body of the victim was seriously disfigured prior to her death. It should also be noted that the victim's hands were bound behind her back so that at least a portion of the brutal stabbing could be inferred to have taken place after the victim had been rendered helpless to resist.

In the course of the sentencing proceeding, the state presented certified copies of previous convictions in Massachusetts for armed robbery and two counts of assault with intent to murder on June 29, 1966. The defendant was also convicted of robbery in Rhode Island in 1968. He was later convicted of escape and also for many lesser drug offenses. As the trial justice noted, defendant had only been released from a correctional institution in Massachusetts approximately one month prior to committing the murder of the victim in the case at bar. As the trial justice found, defendant has spent most of his adult life incarcerated for crimes of violence.

On this record we are of the opinion that the trial justice was supported by ample evidence in reaching the conclusion that this defendant should be subjected to the penalty of life imprisonment without parole. In the exercise of our independent judgment, we affirm the imposition of that sentence.

For the reasons stated, the appeal of the defendant is denied and dismissed. The judgment of conviction is affirmed, and the imposition of the sentence of life imprisonment without parole is affirmed. The papers in the case may be remanded to the Superior Court.