COMMONWEALTH *vs.* GENE E. TRAVIS.

Bristol. March 6, 1990. - July 12, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Homicide. Robbery. Kidnapping. Jurisdiction,* Of crime. *Practice, Criminal,* Venue, Instructions to jury, Argument by prosecutor, Mistrial, Sentence. *Evidence,* Other offense, Relevancy and materiality, State of mind, Motive, Consciousness of guilt.

Pursuant to G. L. c. 277, § 62, the Superior Court in Bristol County properly exercised jurisdiction to try indictments charging first degree murder, kidnapping, and unarmed robbery where the evidence was sufficient to allow the jury reasonably to conclude that, although remains of the victim were discovered in Rhode Island, the defendant had inflicted "violence or injury" on the victim while she was within Massachusetts, and that this "violence or injury" had led to the victim's death [7-9], and where the judge properly instructed the jury regarding the requirements of G. L. c. 277, § 62 [9-10].

At the trial of indictments charging first degree murder, kidnapping, and unarmed robbery, the defendant was not prejudiced by the prosecutor's suggestion during his closing argument that the jury could infer from the evidence that the victim's hands had been bound with electrical

cord when she left a store with the defendant where, based on evidence presented at trial, the jury reasonably could make such an inference and where, in any case, the judge properly instructed the jury that the closing arguments were not evidence. [10-12]

At the trial of indictments charging first degree murder, kidnapping, and unarmed robbery, the judge's admission of testimony regarding statements made by the defendant to a correction officer at a State prison prior to the defendant's impending release from custody and approximately three and one-half weeks prior to the victim's disappearance did not, in the circumstances, create a substantial likelihood of a miscarriage of justice either on the ground that the testimony alerted the jury to the fact that the defendant had a prior criminal record, thereby impermissibly prejudicing his defense, or on the ground that the statements made to the correction officer were too remote to have a bearing on the defendant's state of mind at the time of the robbery and were unduly prejudicial. [12-15]

At the trial of indictments charging first degree murder, kidnapping, and unarmed robbery, the judge did not err in admitting the testimony of a Rhode Island correction officer who testified that, during a supervised visit between the defendant and his mother at a Rhode Island correctional facility, he overheard the defendant say that he knew he was going to be indicted for murder and that he could "give [the authorities] a body," with which he wanted to strike a "deal," where such evidence was clearly relevant to show consciousness of guilt on the part of the defendant. [15-16]

At the trial of indictments charging first degree murder, kidnapping, and unarmed robbery in which there had been testimony that a roll of forty quarters had been taken from a store on the day an employee of the store had disappeared, the judge's admission of evidence that the defendant had forty-two quarters in his pocket when he was arrested in Rhode Island did not create a substantial likelihood of a miscarriage of justice, where the defendant was free to put evidence before the jury that those coins had been linked to the murder of a Rhode Island shopkeeper, and had no connection to the robbery for which he was on trial but, instead, made a tactical decision not to do so. [16]

Where, although a judge in sentencing a defendant convicted of first degree murder, kidnapping, and unarmed robbery was within his discretion in imposing a "from and after" sentence for the unarmed robbery rather than a concurrent sentence, the judge's statement that he would adopt the prosecutor's recommendation of a concurrent sentence cast doubt on his intent regarding the sentence imposed, this court remanded the case to the trial court for a clarification regarding the time from which the sentence for unarmed robbery should begin to run. [16-17]

INDICTMENTS found and returned in the Superior Court Department, one on April 3, 1986, and two on April 18, 1986.

The case was tried before *Robert S. Prince*, J.

*Charles K. Stephenson* for the defendant.

*Cynthia A. Vincent*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant, Gene E. Travis, appeals from his convictions of murder in the first degree, kidnapping, and unarmed robbery. He asserts various claims of error, each of which we discuss below. We affirm the convictions, and, after our review of the case on both the law and the evidence, we conclude that we shall exercise our power under G. L. c. 278, § 33E (1988 ed.), only to remand the case for a clarification regarding the defendant's sentence.

We summarize the facts as the jury could have found them. On December 9, 1985, at approximately 5 P.M., Simone Auger left her place of employment, Spooner Business Services. As was her custom, she headed to Fall River to work at a video store owned by her father, Emile Auger. On arriving at the video store, known as Globe Video, Simone spoke briefly with her father, who then left the store to go home for supper. At this time Simone was the only employee in the store. Prior to Simone's arrival, Emile Auger had transferred money, including a roll of forty quarters, from a cash drawer in an inner office to the cash register in the store.

At approximately 5:40 P.M., an automobile similar in description to the defendant's automobile, a dark-colored Monte Carlo, was seen parked near Globe Video. A witness, Antonio Pavao, saw a man fitting the description of the defendant walk towards Globe Video until he was out of Pavao's line of vision, only to return to his car approximately one minute later. The man repeated this conduct twice more. On his third return to the automobile, the man was accompanied by Simone. The man walked on the outside of the sidewalk, with Simone to the inside. The couple walked slowly. Simone carried with her a pocketbook. When they reached

the parked automobile, the man walked with Simone to the passenger side of the automobile and opened the passenger door. At this, Simone "jumped back." The man then placed his hand on Simone's back, and Simone entered the automobile.

Another witness, Maria Senay, testified that on the evening of December 9, 1985, she left her house at 5:30 P.M. to walk to her parents' home. Several blocks from her house, Mrs. Senay paused to look at the posters in the window of Globe Video. At this time, she saw the defendant inside Globe Video.

Between 6:10 and 6:15 P.M., Maria Fragoza and Wayne Raymondo arrived at Globe Video. Except for themselves and another customer, they found the store deserted. Mr. Raymondo called the Fall River police, who in turn telephoned Emile Auger. When Mr. Auger arrived at Globe Video, he found that the cash register had been emptied, and that Simone's coat, gloves and keys remained in the back room where she had placed them earlier. Simone was not in the store, and could not be located.

The next day, December 10, 1985, the defendant was stopped and arrested on unrelated charges in Rhode Island by an officer of the Greenwich, Rhode Island, police department. A large roll of bills as well as forty-two quarters were found in the defendant's pockets. On December 11, 1985, an officer of the North Kingston police department executed a search warrant on the defendant's automobile and seized a length of electrical cord from the automobile's back seat. The officer also used an "evidence vacuum" to obtain material from various areas of the automobile. That same day, Simone Auger's pocketbook was retrieved from a trash container in an industrial area of Warwick, Rhode Island.

Approximately four months later, on April 9, 1986, the partially decomposed body of Simone Auger was discovered on an over-grown lot in Tiverton, Rhode Island. A length of electrical cord with loops was recovered from the brush nearby. The victim was found on her back, with her sweater pulled up over her upper torso.

After an autopsy of the body, the Deputy Chief Medical Examiner for the State of Rhode Island, Christine Sweeney, determined that Simone had died of asphyxiation due to strangulation, either by ligature or by use of the assailant's hands. During the autopsy Dr. Sweeney also discovered several undigested bits of apple in the victim's stomach. According to Dr. Sweeney, Simone had died at some time between two and eight hours after eating the apple. A co-worker of Simone's at Spooner Business Services had seen Simone eating an apple on December 9, 1985, at approximately 2:30 P.M. Sweeney could not determine whether Simone had been killed in the same place where her body was found.

On April 3, 1986, a Bristol County grand jury returned an indictment charging the defendant with the kidnapping of Simone Auger. On April 18, 1986, the grand jury returned two additional indictments against the defendant charging him with the armed robbery of Simone Auger at Globe Video and the murder of Simone Auger.

The defendant's trial began on March 15, 1988, and proceeded until April 8, 1988. In addition to the evidence we have already described, the Commonwealth introduced the testimony of Federal Bureau of Investigation Special Agent Alan Robillard.[1] Robillard testified that he performed an examination of hair samples taken from the victim and from the defendant's automobile, as well as the pieces of electrical cord which had been found near the victim's body and in the back seat of the defendant's automobile. Based on his examination, Agent Robillard determined that the two pieces of electrical cord had been broken apart from a single length of cord. He also discovered that the hair samples of the victim and the hair samples taken from the defendant's car shared the unusual characteristic of a "looped cuticle." It was Agent Robillard's opinion that the hair from the defendant's automobile "could have" been that of Simone Auger.

---

[1] We will discuss the testimony of other witnesses presented by the Commonwealth in our discussion of the defendant's claims of error, *infra*.

At the close of the Commonwealth's case, the defendant moved for a required finding of not guilty on all the indictments. The indictment alleging armed robbery was reduced to unarmed robbery, while the first degree felony-murder charge was reduced to second degree felony-murder. The motion for a required finding of not guilty as to murder in the first degree by deliberate premeditation and as to the kidnapping charge was denied.

On April 8, 1988, after three days of deliberations, the jury found the defendant guilty of murder in the first degree committed with deliberate premeditation, unarmed robbery and kidnapping. The judge sentenced the defendant to life imprisonment for the first degree murder, to be served from and after a life imprisonment sentence the defendant was serving in Rhode Island.[2] The judge also sentenced the defendant to life imprisonment for the unarmed robbery, to be served from and after the life sentence for first degree murder. Finally, the judge sentenced the defendant to eight to ten years for the kidnapping, to be served concurrently with the life imprisonment sentence for unarmed robbery.

On appeal, the defendant raises issues regarding alleged errors in: (1) the Superior Court's assumption of jurisdiction over this case; (2) the judge's instructions to the jury; (3) the prosecutor's closing statement to the jury; (4) the judge's admission of certain evidence; and (5) the judge's imposition of sentence on the defendant. The defendant claims that these alleged errors require the reversal of his convictions. We dis-

---

[2]The defendant had been convicted of the murder in the first degree of a Rhode Island shopkeeper. *State* v. *Travis*, 568 A.2d 316, 319 (R.I. 1990). As part of his appeal in that case, the defendant had challenged the validity of his arrest and the admission at his trial of certain evidence seized pursuant to his arrest. *Id*. Prior to the ruling of the Rhode Island Supreme Court on these issues, the defendant filed a motion in this court requesting that we not treat the issues as waived for the purposes of his Massachusetts appeal. On January 9, 1990, the Rhode Island Supreme Court upheld the defendant's first degree murder conviction, ruling that the defendant's arrest in Rhode Island had been lawful and that the admission of the contested evidence had been proper. *Id*. At oral argument before this court, the defendant waived his motion regarding the Rhode Island arrest and the evidence.

agree. We shall address each issue raised by the defendant in turn.

1. *Jurisdiction.* In the present case, the body of a Massachusetts woman, who had last been seen in Fall River, Massachusetts, was discovered in Tiverton, Rhode Island. In light of the multi-jurisdictional aspect of the case, the prosecutor, prior to trial, filed a petition pursuant to G. L. c. 277, § 57A (1988 ed.), with the Superior Court for Bristol County for leave to proceed with the trial.[3] This petition was granted, and, pursuant to G. L. c. 277, § 62, the Bristol County Superior Court exercised jurisdiction over the case. General Laws c. 277, § 62 (1988 ed.), states: "If a mortal wound is given, *or if other violence or injury is inflicted,* or if poison is administered, in any county of the commonwealth, by means whereof death ensues without the commonwealth, the homicide may be prosecuted and punished in the county where the act was committed" (emphasis supplied).

The defendant argues that the Superior Court erroneously exercised jurisdiction over this case under G. L. c. 277, § 62, because insufficient evidence was produced to allow the jury to conclude beyond a reasonable doubt that Simone Auger had been murdered or subjected to any violence which led to her death while she was still within the boundaries of Bristol County. The defendant also argues that the judge erroneously instructed the jury regarding the requirements of G. L. c. 277, § 62, because, the defendant claims, the judge instructed the jury that G. L. c. 277, § 62, would be satisfied if the defendant had inflicted "any bodily harm" on Simone

---

[3]General Laws c. 277, § 57A, states: "A defendant shall not be discharged for want of jurisdiction if the evidence discloses that the crime with which he is charged was actually committed without the county or the territorial jurisdiction of the court in which he is being tried; provided, that the attorney general or the district attorney petitions to the court before proceeding with the trial for leave to proceed, stating that he is in doubt from the state of the evidence then in his possession as to whether or not the crime was committed within the county or the territorial jurisdiction of the court, and the court after hearing said petition orders the trial to proceed."

Auger, regardless whether the harm was related to her death.

"Whether a criminal act occurred within the territorial boundaries of the Commonwealth, and thus whether the Commonwealth has jurisdiction over the individual charged with that act, is a question of fact to be settled by proof." *Commonwealth* v. *Gilbert*, 366 Mass. 18, 28 (1974). As such, it is an issue entrusted to the deliberative process of the jury. See *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 671-672 (1974); *Commonwealth* v. *Gilbert*, *supra* at 29. On the appeal of such an issue, "the only question we must consider is whether the evidence 'gives rise to "reasonable and possible" inferences supportive' of [the jury's] finding." *Id.*, quoting *Commonwealth* v. *Lussier*, 364 Mass. 414, 420 (1973).

We believe that the evidence presented in this case entitled the jury to draw a "reasonable and possible" inference that Simone Auger had suffered "violence or injury" at the hands of the defendant while still in the Commonwealth, and that this act had led to her death. The jury found beyond a reasonable doubt that the defendant had kidnapped Simone from the video store in Fall River, Massachusetts. It is arguable that this injury inflicted by the kidnapping of the victim suffices to give jurisdiction to the Superior Court under § 62. *Commonwealth* v. *Macloon*, 101 Mass. 1, 23 (1869). In addition, there was testimony, described in more detail in part 2 of this opinion, from which the jury reasonably could conclude that the defendant had bound Simone's hands with electrical cord prior to leaving Globe Video. The jury also heard testimony that while kidnapping Simone from the video store, the defendant had prevented Simone from leaving his car by pushing against her body with his hand. In the context of a kidnapping, it can quite reasonably be inferred that the defendant pushed Simone without her consent. Offensive physical contact, such as a push or a binding of hands, undertaken without consent, constitutes a battery in the Commonwealth. *Commonwealth* v. *Burke*, 390 Mass. 480, 482-483 (1983). The jury also found beyond a reasonable doubt that the defendant had committed an unarmed

robbery at Globe Video while Simone was the only employee present. One of the methods by which unarmed robbery may be accomplished is "by force and violence." See G. L. c. 265, § 19. Finally, we note that there was evidence from which the jury could conclude that Simone did not die in the wooded lot where she was discovered. See *Commonwealth* v. *DiMarzo, supra* at 672. The medical examiner could not determine that Simone had died where her body was discovered, and the jury, drawing on the evidence presented regarding the position of the body and the arrangement of her clothing, could reasonably have adopted the prosecutor's suggestion that Simone was dead before she had been dragged into the thickly wooded area. We conclude that the evidence presented to the jury allowed them reasonably to conclude that the defendant had inflicted "violence or injury" on Simone while she was within Massachusetts, and that this "violence or injury" had led to Simone's death.

The defendant argues, however, that the jury could not have properly applied G. L. c. 277, § 62, because the judge improperly instructed the jury regarding the requirements of G. L. c. 277, § 62. We note that the defendant's appellate counsel concedes that trial counsel voiced only a general objection to the judge's instruction regarding jurisdiction under G. L. c. 277, § 62. In these circumstances, our review of the judge's charge "is limited to determining whether there is an error in the charge which creates a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E." *Commonwealth* v. *Reid*, 384 Mass. 247, 258 (1981).

The judge instructed the jury that, "if you find that death ensued outside the Commonwealth, then it is the law of the Commonwealth that if a mortal wound is given or if other violence or injury is inflicted in any County of the Commonwealth, it doesn't have to be Bristol, it might be any other county of the Commonwealth, by means whereof death ensued outside the Commonwealth, the homicide may be prosecuted and punished in the County where the act was committed. And because of a paper which is filed in this case by the Commonwealth, I charge you as a matter of law that if you

are satisfied beyond a reasonable doubt that a mortal wound or other violence or injury was inflicted upon this victim anywhere within the Commonwealth of Massachusetts, and death ensued, the offense may be punished here in this County of Bristol where you now sit as a jury. *The language of the statute is not limited to cases where a blow is struck or poison given. Any bodily harm which is caused to be suffered by the act of the accused is an injury inflicted within the meaning of the statute*" (emphasis added).

The defendant objects to the underlined language, claiming that it allowed the jury to find that G. L. c. 277, § 62, was satisfied if they found that the defendant had inflicted "any bodily harm" on the victim, regardless of its relationship to her death. We disagree. We conclude that the contested language, when considered in the context of the judge's charge as a whole, refers not to the relationship between the injury inflicted and the victim's death, but rather to the types of injury encompassed by G. L. c. 277, § 62. In this case, in which the jury was asked to apply a statute describing "wounds" and the administration of "poison" to a factual situation in which a woman had been killed by strangulation, the judge was emphasizing the fact that G. L. c. 277, § 62, is not limited to cases of poisoning or physical beating. Throughout his charge, the judge repeatedly emphasized the need for a connection between the bodily harm inflicted on the victim and the victim's death. No reasonable juror could have understood the contested instruction to mean that a finding as to any bodily harm inflicted by the defendant on the victim would be sufficient to satisfy G. L. c. 277, § 62. We perceive no error and, thus, no substantial likelihood of a miscarriage of justice.

2. *The prosecutor's closing statement.* During his closing argument, the prosecutor suggested to the jury that they reasonably could infer from the evidence that Simone's hands had been bound with electrical cord when she left Globe Video with the defendant. The defendant concedes that there was evidence permitting an inference that Simone had been bound at some time, but argues that the suggestion that Si-

mone was bound at Globe Video was pure conjecture. The defendant claims that the prosecutor's remarks were so prejudicial that a new trial must be ordered. We disagree.

Again, the defendant's counsel concedes that the defendant's trial counsel did not object properly at trial to the prosecutor's statements. Nonetheless, we examine the prosecutor's comments in accordance with our duty under G. L. c. 278, § 33E, to determine if a substantial likelihood of a miscarriage of justice has occurred. See *Commonwealth* v. *Cifizzari*, 397 Mass. 560, 578 (1986); *Commonwealth* v. *Corriveau*, 396 Mass. 319, 336 (1985).

In his closing argument, the prosecutor, referring to the looped electrical cord found in the defendant's car, made the following statement: "Ask yourselves, if you can infer, that at some point, when Miss Auger left the store, with her pocketbook in a certain way and her hands in a certain way, ask yourselves, do you think her hands or arms might have been inside of those loops?" We do not believe that this statement invited the jury to engage in impermissible conjecture. A length of electrical cord with loops in it was found near Simone's body. There was evidence that this piece of electrical cord had been split from a piece of cord found in the defendant's automobile. There was also evidence that when the defendant kidnapped Simone Auger from Globe Video, she held her hands in front of her, and that the defendant, not Simone, opened the passenger door of the automobile. From this evidence, the jury reasonably could conclude that the defendant acted not out of courtesy, but out of necessity because Simone could not open the door with bound hands. Finally, there was evidence that, while sitting in the automobile with the defendant for approximately one minute, Simone made no attempt to reopen the door despite the fact that she was being kidnapped. Based on the evidence presented at trial, the jury reasonably could infer that Simone's hands had been bound by the defendant prior to leav-

ing Globe Video.[4] Therefore, the prosecutor's comments were proper.

Finally, we note that the judge properly instructed the jury that the closing arguments of defense counsel and the prosecutor are not evidence. *Commonwealth* v. *Richenburg*, 401 Mass. 663, 675 (1988). In light of these circumstances, we perceive no substantial likelihood of a miscarriage of justice due to the prosecutor's closing argument. *Commonwealth* v. *Cifizzari, supra* at 579-580.

3. *Admission of evidence.* At trial, over the defendant's objection, the judge allowed the introduction of the testimony of two correctional officers regarding statements made by the defendant in their presence. The judge also allowed testimony that, when arrested in Rhode Island, the defendant had forty-two quarters in his pocket. The defendant claims that the admission of this evidence impermissibly prejudiced his defense, and requests this court to exercise its authority under G. L. c. 278, §33E, to grant him a new trial. We decline to do so.

The first testimony to which the defendant objects is that of John W. Kilnap who, at the time of the trial, was a correction officer at the Massachusetts Correctional Institution (M.C.I.), Cedar Junction. Kilnap testified that on November 6, 1985, approximately three and one-half weeks prior to the robbery at Globe Video, he met with the defendant to discuss the defendant's impending release from custody. Kilnap stated that when he asked the defendant if he had a job waiting for him on his release from prison, the defendant said, "No, I don't." When he asked the defendant how he was going to support himself, the defendant replied, "I'm just going

---

[4]The defendant, in his argument that the evidence does not support an inference that Simone's hands were bound when she was kidnapped from Globe Video, places particular emphasis on the testimony of an eyewitness that the defendant and Simone walked to the defendant's automobile "like family." However, on cross-examination by defense counsel, this witness testified that by the phrase "like family," he meant that the defendant and Simone were walking slowly, not speaking, and that the defendant appeared to be older than Simone.

to rob somebody." Kilnap asked the defendant, "What if somebody puts up a fight?" The defendant responded, "I'll just get a gun and kill them." Finally, Kilnap asked the defendant whether it would not be easier to "get a job and support yourself and work for a living," the defendant replied, "No, it's much easier to kill somebody, rob and kill somebody, than to get a job and work for a living." It was clear from Kilnap's testimony that the defendant had been imprisoned at M.C.I., Cedar Junction, prior to the date of Simone's disappearance. The defendant contends that Kilnap's testimony alerted the jury to the fact that he had a prior criminal record, thereby impermissibly prejudicing his defense. The defendant also argues that the statements made to Kilnap should not have been admitted because they were too remote to have a bearing on the defendant's state of mind at the time of the robbery at Globe Video and were unduly prejudicial.

"It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing his bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). In the present case, the judge allowed Kilnap's testimony for the purpose of demonstrating the defendant's state of mind or motive. *Id.* It is clear from the judge's side-bar discussions with the prosecutor and defense counsel that he recognized the prejudice inherent in Kilnap's testimony. Nevertheless, the judge concluded that the prejudice generated by the disclosure of the defendant's prior imprisonment did not outweigh its probative value. *Commonwealth* v. *Young*, 382 Mass. 448, 463 (1981). Therefore, he chose not to exclude the testimony. *Id.* A trial judge's discretion in this regard will not be overturned on appeal unless "palpable error" is shown to be present. *Id.* We perceive no such error.

The judge, immediately after Kilnap's testimony, gave limiting instructions to the effect that "[t]his testimony obviously is not admitted for the proof in any way that [the de-

fendant] committed the murder in question that is here before the Court. The testimony is admissible for the limited purpose of indicating state of mind, or motive, if any, and for that limited purpose you may consider the statement." The judge also instructed the jury that it was up to the jury to "deal with the question in your mind as to when [the statement] happened, or as to whether it was remote or whether it was in any way related to motive and intent at the time that the alleged offenses here stated were committed." Therefore, the judge made it clear to the jury that they were to consider the evidence of the defendant's statement in the context of his release from prior imprisonment only to the extent that it related to the defendant's state of mind or motive, and not to use it to infer that the defendant had the propensity to commit the crimes with which he was charged. "Jurors are expected to follow instructions to disregard matters withdrawn from their consideration." *Commonwealth* v. *Helfant, supra* at 228, quoting *Commonwealth* v. *Cameron,* 385 Mass. 660, 668 (1982). "The judge's instructions were clear, and we must presume the jury followed them." *Id.*

We agree with the defendant that generally the better course would have been to elicit Kilnap's testimony regarding his conversation with the defendant without revealing to the jury that the conversation took place in a State prison. Whether the statement could have been so redacted in these peculiar circumstances is difficult to perceive, as the statement could be reported meaningfully only in the context in which it was made. In the circumstances of this case, the disclosure of the defendant's prior imprisonment does not constitute reversible error. "The [prior imprisonment] was not dwelt upon in undue detail calculated to put pressure on the jury, and the judge's instructions advised the jury to adopt a dispassionate attitude toward the proofs." *Commonwealth* v. *Young, supra* at 463. In addition to the judge's limiting instructions, the defendant was able to utilize his right to cross-examine Kilnap to suggest to the jury that a hostile relationship existed between Kilnap and the defendant at the time of their conversation. As was suggested by the

judge's instructions to the jury following Kilnap's testimony, the jury were free to disregard Kilnap's testimony on this basis. Furthermore, the judge instructed the jury that they could disregard the statement if they found it was too remote from the date of the offenses with which the defendant was charged. We decline to say that the three-week span between the conversation and the robbery at Globe Video rendered the conversation inadmissibly remote. "The question of remoteness is largely within the sound discretion of the trial judge, and there is nothing to indicate an abuse of discretion in this regard." *Commonwealth* v. *Bryant*, 390 Mass. 729, 744 (1984), quoting *Commonwealth* v. *Baldassini*, 357 Mass. 670, 679 (1970). Kilnap's testimony did not present a substantial likelihood of a miscarriage of justice.

The defendant also objects to the testimony of another correction officer, Darryl Bonaparte. Bonaparte testified that while employed at the Adult Correction Institution in Cranston, Rhode Island, he supervised a visit between the defendant and the defendant's mother on December 16, 1985. Bonaparte testified that he overheard the defendant tell his mother that "he was about to be indicted for murder, and that he wanted a deal. He could give [the authorities] a body, but, no deal, no body." The defendant argues that the Commonwealth failed to prove that this testimony related to the murder of Simone Auger, rather than the murder in Rhode Island for which the defendant was subsequently convicted. See note 2, *supra.* The defendant argues further that the prejudicial impact of the testimony, when considered against its relevance, required the judge to exclude the testimony at trial. We disagree.

Evidence that the defendant knew he was going to be indicted for murder and that he knew of a body with which he could strike a "deal" with the authorities was clearly relevant to show consciousness of guilt on the part of the defendant. *Commonwealth* v. *Williams*, 378 Mass. 217, 229 (1979). *Commonwealth* v. *Leo*, 379 Mass. 34, 41 (1979). *Commonwealth* v. *Tracy*, 27 Mass. App. Ct. 455, 463-464 (1989). The fact that the defendant was implicated in two murders

at the time he made the statement in question did not require the prosecutor to link affirmatively the defendant's statement with the murder of Simone Auger. The defendant was free to present evidence to explain to the jury to which murder he was referring when he spoke with his mother. Hard choices for the defendant, brought about by his own illegal activity, do not require this court to intervene on his behalf. There was no error.

Finally, the defendant objected to the admission of evidence that he had forty-two quarters in his pocket when he was arrested in Rhode Island on December 10, 1985. Emile Auger had testified that a roll of forty quarters had been taken from Globe Video on the day Simone was kidnapped. The defendant argues that because this evidence was introduced and used against him in his trial for murder in Rhode Island, it is fundamentally unfair to allow its introduction in a trial for a separate crime. See *State* v. *Travis*, 568 A.2d 316 (R.I. 1990).

Again, we note that the defendant was free to put evidence before the jury that those coins had been linked to the murder of a Rhode Island shopkeeper, and that they therefore could have no connection to Globe Video. That he made a tactical decision not to do so, for obvious reasons, presents no fundamental unfairness or inequity requiring the application of our powers under G. L. c. 278, § 33E.

4. *Sentencing.* At the sentencing hearing, the prosecutor recommended that the defendant be sentenced to life imprisonment for the first degree murder conviction, to run from and after the life sentence the defendant was serving in Rhode Island. The prosecutor also recommended that the defendant be sentenced to life imprisonment for the unarmed robbery, to run concurrently with the life sentence for first degree murder. Finally, the prosecutor asked the judge to impose on the defendant a concurrent sentence of eight to ten years for the kidnapping conviction. The judge stated that "this Court is going to impose the sentence recommended by the District Attorney in this occasion." However, the judge's statement of sentencing differed from the prosecutor's recom-

mendation in that the life sentence for unarmed robbery was imposed "from and after the expiration of the mandatory life imprisonment sentence for first degree murder" rather than concurrently with that life sentence for murder.

While it was within the discretion of the judge to impose a "from and after" sentence for the unarmed robbery rather than a concurrent sentence, the judge's statement that he would adopt the prosecutor's recommendation of a concurrent sentence casts doubt on the judge's intent regarding this sentence. The Commonwealth concedes this point. Accordingly, we remand this case to the Superior Court for a clarification regarding the time from which the life sentence for unarmed robbery shall begin to run.[5] The judgments are affirmed.

*So ordered.*

---

[5]We perceive no other reason to exercise our powers under G. L. c. 278, § 33E, regarding this case.